A precursory reference to some of the principal events will suffice to exhibit the essence of the intermediate application made by the Attorney-General and at present submitted for decision in this cause.
During several years immediately preceding the year 1941, many companies possessing franchises to maintain and operate *Page 450 
railroads within our state failed to pay the taxes levied and assessed upon their properties devoted to such use, and the efforts of the state to enforce the payment of the taxes were persistently resisted. These accumulating delinquencies for the tax years 1932-1940, inclusive (mimima $34,358,969.40 taxes, plus $24,130,085.84 interest on December 31st, 1940) ultimately evoked considerable interest and anxiety. At its session in 1941 the legislature enacted an act, entitled "An act relating to the collection of certain delinquent taxes upon railroad companies," now identified as chapter 290 (P.L. 1941 p. 768). The act was approved on July 22d 1941.
On September 4th, 1941, the Attorney-General in his official capacity filed in this court an information in which he alleged that the act was in defiance of certain provisions of our state constitution, and prayed for an injunction restraining the state treasurer from pursuing the terms of the statute.
At the succeeding session of the legislature an act was passed amending the title and body of the former act and supplementing its provisions. This latter act was approved on May 21st, 1942, and is distinguished as chapter 241 (P.L. 1942 p. 651).
On March 16th, 1942, the defendant, State Treasurer William H. Albright, died and on May 28th, 1942, Honorable Robert C. Hendrickson qualified as his successor. These occurrences subsequent to the presentation of the original information have occasioned the filing of amended and supplemental informations and answers thereto which introduce for ultimate determination the validity of chapter 290 as amended and supplemented by chapter 241 of the laws of 1942.
Incorporated in the former act (chapter 290) was the requirement that each railroad desiring to avail itself of the statutory installment payment plan should enter into a written undertaking in form approved by the Attorney-General. Section7. The amendatory act intended to become effective on May 21st, 1942, amputated from the statute the requirement that the Attorney-General prescribe the form of the acceptance documents.Chapter 241, sections 8 and 9. *Page 451 
Apprehending that it was intended to immediately effectuate and accomplish the purposes of the statute notwithstanding its alleged constitutional infirmities, with consequences possibly prejudicial to the state in the enforcement of its eventual rights, the Attorney-General was granted an order embodying the following terms:
"It is, thereupon, on this twenty-first day of May, 1942, ORDERED that the defendant, James B. Sautter, Deputy State Treasurer, his successors in office, and his and their respective agents and servants be and they are hereby each severally restrained and enjoined from carrying out or executing any and all of the provisions of Chapter 290 of the Laws of 1941 and of Chapter 241 of the Laws of 1942, and from accepting from any railroad taxpayer any acceptance documents, discharges or dismissals, discontinuances, checks or other forms of payment which may be delivered to him or which were heretofore delivered to him, in purported compliance with Chapter 290 of the Laws of 1941 and Chapter 241 of the Laws of 1942, and from depositing any such checks or other forms of payment or distributing the proceeds thereof; and
"It is further ORDERED that the defendant show cause before this Court, at Chancery Chambers, State House Annex, Trenton, New Jersey, on Tuesday, June 2d 1942, at 10:00 A.M. (E.W.T.), or as soon thereafter as counsel may be heard, why the foregoing restraint should not be continued until the final determination of the above entitled matter; and
"It is further ORDERED that leave be and the same is hereby granted to the defendant herein to move to dissolve, enlarge or modify the said restraint upon two days' notice;"
On May 29th, 1942, State Treasurer Hendrickson was made the party defendant in this cause, and the temporary restraint theretofore imposed was made applicable to him. Incidentally, the leave granted to the defendant to apply for a prompt dissolution of the restraint therein contained was not exercised, and the subject-matter of the order was orally argued in January, 1943, followed by the submission of additional briefs.
This cause has not been advanced for final decision, as seems generally to be supposed, upon the affidavits and stipulated facts. The defendant in his brief insists "The matter now before the court is the question whether the above-mentioned preliminary injunction should be continued, or whether the order to show cause and the restraint therein contained should be discharged." Defendant's brief, page 2. *Page 452 
The informant has reserved the opportunity to disclose at final hearing that the partial payments heretofore made by the defaulting railroad companies were erroneously applied in toto
to delinquent taxes and not in part to the reduction of the interest. Informant's brief, pages 17, 18.
In this situation it seems that the amount of principal taxes due to the state is intended to be disputed at final hearing. The informant declares that the principal taxes amount to $45,625,519.83. The defendant insists that they aggregate $34,358,969.40. The difference, $11,266,550.43, is substantial. This factual dispute of itself is a cogent reason to meanwhile restrain precipitate action by the State Treasurer. The propriety of the applications of the payments will depend, of course, upon the circumstances, concerning which no evidence has yet been introduced. Holcombe v. Holcombe, 74 N.J. Law 257;65 Atl. Rep. 855; Baker v. Baker, 28 N.J. Law 13; Meredith v. Banks,6 N.J. Law 408; Collerd v. Tully, 77 N.J. Eq. 439;77 Atl. Rep. 1079; affirmed, 78 N.J. Eq. 557; 80 Atl. Rep. 491; Story v.Livingston, 13 Pet. (U.S.) 359; Harlan v. Houston,258 Fed. Rep. 611; McWhorter v. Bluthenthal, 96 Am. St. Rep. 43,69, 70 and 71; 30 Am. Jur. tit. "Interest" 40, 41 § 50; 33 C.J.250 § 168.
Therefore, the order to show cause why the temporary restraint should not be continued until the final hearing constitutes in reality the sole controversial issue calling for immediate determination.
It is at once conceived that this litigation does not involve the personal and individual rights of the litigants. The informant is prosecuting the proceeding as the Attorney-General of the state. The defendant participates as the treasurer. Both are obliged by their oaths to support the constitution of the state, and both are enjoined by their official duties to serve and safeguard the rights of the state. It is assumed that the discord arises from a diversity of opinion rather than from dissimilar motives. Thus, the familiar principle recommending the balancing of equities and the resulting conveniences and inconveniences, advantages and disadvantages to the individual litigants has little, if any application. Vide, Stevens v.Busch Cleaners and Dyers Service, *Page 453 Inc., 116 N.J. Eq. 331, 334; 171 Atl. Rep. 821. The supreme law monitor of the state government is convinced that the statutes mentioned offend the state constitution. One would ordinarily expect that his opinion would be heeded by all departments and agencies of the state. Normally, the responsibility of advising the state officials in matters of law is his. But see, P.L. 1941ch. 391 p. 1012. He has instituted proceedings which will ultimately achieve a final adjudication of the constitutionality of this legislation. The object of his present application is to maintain the status quo until the validity of the statutes is finally resolved. The restraint is not sought in aid of private right but in a matter essentially public juris. There is respectable authority that in such case it is not a matter of judicial discretion, but an absolute duty on the part of the court to grant the writ. The Attorney-General v. RailroadCompanies, 35 Wis. 425. It must be borne in mind that only public rights are here involved.
The power to issue an injunction pendente lite is exercised whenever necessary to subserve the ends of justice. Mr. Justice Heher, speaking for the Court of Errors and Appeals, recently observed: "And it goes without saying that justice is not served if the subject-matter of the litigation is destroyed or substantially impaired during the pendency of the suit, and thus the court loses the faculty of fully vindicating such right and of remedying such wrong as may be revealed on final hearing. Doubt of the validity of the complainants' asserted cause of action is therefore not an adequate reason for refusing to maintain the subject of litigation in statu quo pending a definitive settlement of the right on final hearing. Unless such be the rule, the final hearing, and the appeal in the event of an adverse decree, would be vain forms." Christiansen v. Local680 of the Milk Drivers, c., 127 N.J. Eq. 215, 219;12 Atl. Rep. 2d 170. The granting or refusal of a preliminary injunction exacts the exercise of a sound judicial discretion
in view of all the circumstances of the particular case.
Notwithstanding the intermediate character of the present order, the constitutional questions involved have been elaborately *Page 454 
debated by counsel with much industry, learning and ability. Voluminous affidavits have been submitted and examined. The numerous decisions cited in the briefs have been studiously explored. To specifically cite and comment upon each would necessitate an extravagant expenditure of words and protract this memorandum to an inordinate length.
It has been suggested that the Attorney-General lacked official authority to file the information. The office of Attorney-General is of ancient origin. The Attorney-General in England was appointed by letters patent from the crown, and under the common law he was the chief law officer and legal adviser of the crown upon whom devolved the management of its legal affairs and the prosecution of all suits, civil and criminal, in which the crown was interested. Blk. Com. 308-310; 2 R.C.L. 915 § 4; 6 Corp.Jur. 805 § 1; 6 Holdsworth, History of English Law 466; Howard,Criminal Justice in England 273; De Long, Powers and Duties ofthe State Attorney-General in Criminal Prosecutions; 25 Journalof Criminal Law and Criminology 363-365. Upon the organization of governments in this country most, if not all, of the commonwealths which derive their system of jurisprudence from England, adopted in their governments the office of Attorney-General. The governmental prerogatives are here vested in the people, and there was immediately recognized a similar necessity in our governments for the creation of a public officer charged with the official authority and obligation to protect the public rights and enforce public duties by proper proceedings in the courts of justice. With the office came all the common law duties and all the power and authority appertaining to the office at the common law in so far as they were applicable and in harmony with our system of government. The common law duties, unless abridged by the constitution or legislative enactment of the state, are very numerous and diversified. People v. Miner,2 Lans. (N.Y.) 396; Hunt v. Chicago, Horse and DummyRailway Co., 121 Ill. 638; 13 N.E. Rep. 176; State, ex rel.Young v. Robinson, 101 Minn. 277, 288; 112 N.W. Rep. 269, 272;20 L.R.A. (N.S.) 1127; State, ex rel. v. Young, 54 Mont. 401,403; 170 Pac. Rep. 947; Commonwealth, *Page 455 ex rel. Minerd v. Margiotti, 188 Atl. Rep. 524; 6 C.J. 810 §13; 2 R.C.L. 917 § 5; 5 Am. Jur. 233.
It was resolved in State v. Zabriskie, 43 N.J. Law 369, reversed on other grounds, Id. 640, that except as modified by constitutional or statutory regulation, the functions of our Attorney-General are similar to those exercised by the representative of the crown at the time of the separation of the colonies. It has also been determined that those functions, in the absence of constitutional limitations, are subject to increase, alteration or abridgment by legislative enactment.Board of Public Utility Commissioners v. Lehigh ValleyRailroad Co., 106 N.J. Law 411; 149 Atl. Rep. 263.
Our statute (R.S. 52:17-2; N.J.S.A. 52:17-2) directs that the Attorney-General shall, when not incompatible with his other duties (and when not relieved of such duties by statute):
"b. Give to the members of the senate and assembly and to the executive and all the officers of the state government, such legal information as they may from time to time request;
 * * * * * * * *
"g. Attend generally to all matters in which the state is a party or in which its rights and interests are involved;
"h. Act as adviser or counsel for all state boards, commissions or other state officials, and, in connection with such assistants as may be employed in his department, be the sole legal adviser, attorney or counsel thereof and represent them in all suits or actions of any kind that may be brought for or against them in any courts of this state."
In Attorney-General v. Delaware and Bound Brook RailroadCo., 27 N.J. Eq. 631, Dixon, J., remarked: "In equity as in the law court, the Attorney-General has the right, in cases where the property of the sovereign or the interests of the public are directly concerned, to institute suit, by what may be called civil information, for their protection. The state is not left without redress in its own courts because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the courts on such questions of public moment." *Page 456 
In the more pertinent case of Wilson, Attorney-General, v.State Water Supply Commission, 84 N.J. Eq. 150, 154;93 Atl. Rep. 732, Mr. Justice Garrison declared:
"Short of compiling a treatise from sources equally available to all, it must suffice to say that the legal jurisdiction of the chancellor centered around two fundamental conceptions — the impeccability of the sovereign and the righteousness of his purposes toward his subjects. The king could do no wrong and the chancellor was the keeper of his conscience. From those conceptions it followed that if a subject was wronged by the king the chancellor would redress it, and that if all of the king's subjects suffered from an act unlawfully done in his name, the chancellor, upon being so informed, would see that right was done.
 * * * * * * *
"With few exceptions, however, the redress of public injuries in the name of the king was instituted by the Attorney-General by an information which, as the name imports, merely informed the chancellor of the existence and nature of the public wrong; it being considered beneath the dignity of the king to pray for relief in his own courts and also that the keeper of his conscience had but to be informed of a public wrong in order to right it.
"Confining our attention to cases resembling in principle the one now before us, the essentials of this jurisdiction were that the information should be exhibited by the Attorney-General as the representative of the sovereign and that it should refer to matters by which the public or public rights were affected by unlawful acts done in the name of the king or by some agency or instrumentality of his government.
"These essentials of jurisdiction, being fundamental principles of the common law, survived the changes wrought by the Revolution, and exist in this country as a part of the common law excepting where altered by constitutions or legislative enactments of which in this state there is no trace."
It has not been regarded as anomalous for the Attorney-General of our state to file informations ex officio challenging the constitutionality of acts of the legislature. State v. SomersPoint, 52 N.J. Law 32; 18 Atl. Rep. 694; Attorney-General *Page 457 
v. Dover, 62 N.J. Law 40; 40 Atl. Rep. 640; State v. Riordan,75 N.J. Law 16; 69 Atl. Rep. 494; McCran v. Ocean Grove,96 N.J. Law 158; 114 Atl. Rep. 15.
Indeed, it was held by the Supreme Court of Florida in State
v. S.H. Kress Co., 115 Fla. 189; 155 So. Rep. 823 (1934), that if the Attorney-General conceives that a statute involving the general public interests is unconstitutional, it is not only his right but his duty to institute ex officio appropriate proceedings to settle the validity of the legislative act.
Moreover, as a matter of public policy, measures to test the legality of proceedings reasonably believed to be in violation of the fundamental law of the state, should be liberally granted.Gimbel v. Peabody, 114 N.J. Law 574, 577; 178 Atl. Rep. 62.
The information in the present cause was properly filed by the Attorney-General by virtue of the inherent authority of his office.
The major pressure of the argument has been applied to the subject of the constitutionality of the two enactments. The defendant asserts that the constitutionality of the acts is indubitable. The informant avows with equal assurance that they are invalid and that the constitutionality of the statutes is at least so enigmatic that no action should be taken pursuant thereto until the stability of the statutes has been judicially abrogated or confirmed.
The duty devolving upon the judicial department to determine, when so required, the constitutionality of legislative enactments is indeed a grave and solemn undertaking which is ordinarily approached with reluctance and must be discharged with the most patient and extensive deliberation. It is not on slight implication and vague conjecture that the legislature shall be declared to have transcended its powers and ignored constitutional limitations. The constitutional limitation must be clear and imperative, and a legislative enactment will not be nullified unless its repugnancy to the constitution is so manifest as to exclude reasonable doubt. It is not the province of courts to supervise legislation, but it is the imperative duty of the courts to condemn that which contravenes the constitution. *Page 458 
"The duty of the court is to uphold the constitution, even if that act shall temporarily operate to the hindrance of some beneficial result." City of Cincinnati v. Harth,128 N.E. Rep. 263, 266.
"The constitution is either a superior permanent law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts, is alterable when the legislature shall please to alter it. If the former of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable." Per Chief-Justice Marshall in Marbury v. Madison, 1 Cranch 137, 177;2 L.Ed. 60.
It is not intimated that the constitutional provisions invoked by the informant are in any degree unjust, unreasonable or outmoded, or that they were not wisely adopted as a part of our basic and superior law.
To expose the controversial questions to a comprehensive view, a summarization of the provisions of the statutes and the invoked provisions of the constitution, seems imperative.
Chapter 290 provides as follows:
Section 1. The State Treasurer is authorized and required to accept, without interest penalties, installment payments of the full principal amount of railroad property taxes which were due December 1st, 1940, and remained unpaid on the effective date of the act. Acceptance of such installment payments is made conditional upon compliance with sections seven and eight.
Section 2. Principal taxes shall be paid within a period not less than two years, nor more than twenty years, determined in accordance with a formula set out.
Section 3. Installment payments shall be made on or before December 1st in each year, in certain specified amounts.
Section 4 is as follows:
"Interest. All interest penalties upon taxes paid pursuant to this act shall be abated and cancelled, except that, in addition to installment payments, interest at the rate of three per centum (3%) per *Page 459 
annum shall be paid annually upon the balance of delinquent taxes remaining unpaid from and after December first, one thousand nine hundred and forty."
Section 5 is as follows:
"Discharge of lien. The liens of the State for taxes and interest penalties of each year for which delinquent taxes are payable pursuant to this act shall be fully satisfied and discharged, in the order in which such taxes accrued, when and as principal payments on account thereof equal or exceed the full principal amount delinquent for any tax year, and interest upon all unpaid balances has been paid in full."
Section 6 provides that the remedies of the state for collection of delinquent taxes shall not be enforced against any taxpayer which enters upon the execution of the installment payment plan provided hereunder, so long as compliance with agreements continue. Upon default in payment of all or part of an installment payable in any year, or of interest upon the unpaid balance, the whole remaining amount of delinquencies, including interest penalties, is reinstated and becomes due and payable.
Section 7 provides that each railroad company may enter upon the installment payment plan by entering into written undertaking, in form approved by the Attorney-General, for the payment of total amount of delinquent taxes, and by paying into the state treasury, the first annual installment.
Section 8 provides that the first payment shall be accompanied by a waiver of any and all rights to contest the legality or amount of any assessment made prior to December 1st, 1941, together with stipulations or other papers for discontinuance of any pending proceedings before any board or court concerning such assessments, in form to be approved by the Attorney-General.
Section 9 contains provisions with respect to consents by the state to reorganization plans.
Section 10 provides that the act shall not apply to assessments other than those upon railroad property, and specifically provides that the act not be construed to authorize any refund, return or credit of any railroad taxes theretofore paid. *Page 460 
 Section 11 provides that receipts under the act shall be distributed as heretofore provided by law and be applied to delinquent accounts in the order in which the delinquent taxes were originally assessed.
Section 12 is as follows:
"Effect of unconstitutionality. If any provision of this act, or the application thereof to any person or circumstances, is held invalid, the remainder of this act, or application of such provision to other persons or circumstances, shall not be affected thereby."
Chapter 241 is entitled as follows:
"AN ACT to amend the title of `An act relating to the collection of certain delinquent taxes upon railroad companies,' approved July twenty-second, one thousand nine hundred and forty-one (1941, c. 290) so that the same shall read `An act providing for the collection of unpaid taxes heretofore assessed upon property used for railroad purposes, for any or all of the years one thousand nine hundred and thirty-two to one thousand nine hundred and forty, inclusive, and also providing for the remission of unpaid interest penalties with respect to taxes heretofore assessed upon such property for any or all of said years,' and to amend the body of said act and to supplement said act."
Section 1 amends the title of chapter 290 in the manner indicated in the title. Chapter 241 further amends sections 1 to 11, inclusive, of chapter 290 and adds sections 14 and 15 as supplements thereto.
Section 2 amends section 1 of chapter 290 so as to require the submission of acceptance documents and waivers and the making of the initial payment on or before June 15th, 1942.
Section 3 amends section 2 of chapter 290 but makes no substantial change.
Section 4 amends section 3 so as to require that interest at 3% per annum be paid upon unpaid taxes from December 1st, 1940, to the date of the initial payment to be made under chapter 241, but without any deduction by reason of tenders which may have been submitted to the State Treasurer pursuant to chapter 290. Section 4 further requires that the State Treasurer apply under chapter 241 the drafts or checks theretofore delivered to him by any railroad taxpayer in attempted compliance with Chapter 290, upon request therefor by such taxpayer. *Page 461 
 Section 5 amends section 4 to provide that upon acceptance of the provisions of the act by any railroad taxpayer, and so long as payments are made as required by the act, there should be stayed any proceedings to collect any unpaid taxes for the years 1932 to 1940, inclusive, and any statutory interest with respect to any such taxes.
Section 6 amends section 5 to provide that when any railroad taxpayer shall have paid, in the manner provided by the act, the full amount of taxes assessed on its property for the years 1932 to 1940, inclusive, and all interest required to be paid by the act, "such taxpayer and its property shall be released and discharged from any and all claims for statutory interest penalties with respect to any and all taxes assessed against such taxpayer or upon its property used for railroad purposes for any and all of the tax years 1932 to 1940, inclusive."
It will be observed that this amended section is so phrased as to result in the abatement of all interest arrears, rather than the partial abatement which would have been effective under section 4 and section 5 of chapter 290, under the method of allocating payments used by the railroads, as explained above.
Section 7 amends section 6 to provide that the cancellation of interest charges should not become effective until the final payment of the settlement. The amendment also provides that upon default in the making of any payment provided for in the acceptance document and a continuance thereof for thirty days, the remaining unpaid balance of taxes, together with all interest accrued on the taxes in arrears, shall immediately become due and payable, subject to a credit for the amount of interest paid under the settlement plan. It will be recalled that section 5 of chapter 290 provided that the lien of the state for interest on the taxes for any particular year should be abated upon the payment in full of the unpaid balance of principal taxes for that year, regardless of any default in the payment of the installments of principal taxes for subsequent years.
Section 8 amends section 7 so as to eliminate the requirement that the Attorney-General approve the forms of the *Page 462 
acceptance documents, and sets out the form of acceptance and waiver required.
Section 9 amends section 8 so as to eliminate the requirement that the Attorney-General prescribe the form of discontinuance and dismissal of pending appeals and regulations and prescribes the form of such discontinuances and dismissals.
Sections 10, 11 and 12 amend sections 9, 10 and 11, respectively, in respects not here material.
Section 13 supplements chapter 290 by adding section 14, which contains definitions.
Section 14 supplements chapter 290 by adding section 15, to which reference will be subsequently made.
The following provisions of the constitution of our state are implicated:
Article IV, section 6, paragraph 3:
"The credit of the state shall not be directly or indirectly loaned in any case."
Article I, section 20, added by amendment, proclaimed September 28th, 1875:
"No donation of land or appropriation of money shall be made by the state or any municipal corporation to or for the use of any society, association or corporation whatever."
By an amendment, also proclaimed on September 28th, 1875, article IV, section 7, paragraph 11:
"The legislature shall not pass private, local or special laws in any of the following enumerated cases, that is to say; * * *
"Granting to any corporation, association or individual any exclusive privilege, immunity or franchise whatever. * * *
"The legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws. * * *"
Article IV, section 7, paragraph 4, also added by amendment and proclamation of September 28th, 1875:
"To avoid improper influences which may result from intermixing in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title. * * *" *Page 463 
It is the insistence of the Attorney-General that:
"I. The remission of the interest obligations is a donation or appropriation of money of the state in violation of Article I, paragraph 20, of the Constitution of New Jersey.
"II. The illegality of so much of the appropriation as was made for the purpose of financial relief to the railroads and the supposed consequent general benefits to the state, vitiates the entire remission of interest because of the indivisibility of the appropriation.
"III. The postponement of the time for payment of principal taxes constitutes a donation or appropriation of the use of money of the state in violation of Article I, paragraph 20, of the Constitution of New Jersey.
"IV. The postponement of the time for payment of principal taxes constitutes a loan of the credit of the state in violation of Article IV, section 6, paragraph 3, of the Constitution of New Jersey.
"V. The remission of interest obligations and the postponement of the time for payment of principal taxes, constitute the granting of exclusive privileges and immunities to corporations by a special or private law, in violation of Article IV, section7, paragraph 11, of the Constitution of New Jersey.
"VI. Chapter 290, as amended by chapter 241, violates ArticleIV, section 7, paragraph 4, of the Constitution of New Jersey."
In undertaking to consider the alleged repugnancy of these statutes to article I, section 20 of the constitution, attention promptly falls upon the decision of the late Vice-Ordinary Buchanan in In re Voorhees, 123 N.J. Eq. 142; 196 Atl. Rep. 365
(1938). That decision, delivered by one of the most discerning and erudite judges of our Chancery bench, was twice affirmed, first by the Supreme Court, 121 N.J. Law 594; 3 Atl. Rep.
2d 891, and then by our court of last resort,124 N.J. Law 35; 10 Atl. Rep. 2d 650. Unless the adjudication of that case can be differentiated in principle and rationale from the case at bar, I am obliged to accord it authoritative recognition.
In that cause the constitutionality of chapter 102 of the Laws of 1925 was impugned. The act was nullified because it was in contravention of article I, section 20 of the constitution. The facts may be briefly stated. Elizabeth R. Voorhees died on September 1st, 1924. Under the provisions of her will a legacy was given to the New Jersey College for Women. Thereafter (March 13th, 1925), chapter 102, P.L. 1925, was enacted. It purported to exempt from transfer inheritance taxation, bequests of the character stated, *Page 464 
made after July 1st, 1924. The executor claimed that the legacy was exempt under the provisions of chapter 102. The State Tax Commissioner levied a tax on the transfer, contending that the statute was unconstitutional. Such was the issue which was presented for determination.
It is therefore judicious to discover the respects in which theVoorhees Case and the one sub judice assimilate resemblance. There, as here, a statute expressive of a legislative policy was implicated, which was also challenged as violative of article I, section 20 of our state constitution in that the statute in substance and effect relieved a private corporation from a vested financial liability and obligation owing to the state. In that cause as in this, it was averred that the constitutional prohibition is only against a legislative "appropriation" of money to a private corporation, and that the legislative grant was made upon a legal, equitable or moral consideration.
The Vice-Ordinary announced: "It is concluded, therefore, that there is no soundness to the contention of appellant that the constitutional prohibition is only against a legislative `appropriation' of money, technically as such. A gift of public funds or property to a private corporation is unconstitutional whether made directly or indirectly; and the annulling by the legislature of a financial obligation due from such corporation to the state, the right to which has theretofore already become fixed and vested in the state, is (unless supported by some legal, equitable or moral consideration therefor) such a gift, and hence invalid."
The same principles have been enunciated in the following manner: "It is immaterial whether the funds are actually voted out of the state treasury or are remitted by cancellation of a tax validly due but unpaid. The result is the same, and the constitutional provision was intended to prohibit either form of diversion." In re Guiteras' Estate, 204 N.Y.S. 267; People v.Westchester County, c., 231 N.Y. 465, 475.
The provision of our constitution is general and all-comprehensive. Its application is not confined to a remission of unpaid taxes. See Strock v. East Orange, 77 N.J. Law 382;72 Atl. Rep. 34. The Voorhees Case holds that the *Page 465 
annulling of any fixed and vested financial obligation due the state by a private corporation is in reality a donation or appropriation inhibited by our fundamental law. The scope and range of this decision should not be ignored by a member of the court in which it was rendered.
It is likewise imperative to detect the particulars in which the Voorhees Case and the present one are averred to be divergent. The defendant asserts (1) the legislative remission here reviewed is not of taxes but of "interest penalties," and (2) that the grant bestowed by these statutes was founded upon an adequate "legal, equitable or moral consideration."
The opinion of the Vice-Ordinary in the Voorhees Case does not divulge whether the exemption from the payment of interest on the tax was debated. The subject is not mentioned in the opinions. The statute there challenged made no express reference to interest, and manifestly if there was no valid tax, no interest could accrue. Conversely, if the tax was valid, the interest would by existing statute accompany the tax. The statute of 1925 did not in terms "remit" taxes or interest; it purported to exempt certain testamentary gifts from taxation. If valid, both taxes and interest by reason of its intended retroactive effect would have been released.
An inspection of the file in that cause, however, reveals that the interest on the tax was not in fact exempted. The final decree made by the Ordinary and affirmed on appeal ordained that
"* * * the assessment of transfer inheritance taxes in the matter of the estate of Elizabeth Rodman Voorhees, deceased, in the sum of seventy-five thousand eight hundred sixteen dollars and twenty-nine cents ($75,816.29) on the transfer of her residuary estate to the New Jersey College for Women, be and the same is hereby in all respects affirmed and the appeal dismissed, with costs.
"It is further ordered, adjudged and decreed that the Union County Trust Company, as substituted executor of the last will and testament of Elizabeth Rodman Voorhees, deceased, pay to J.H. Thayer Martin, State Tax Commissioner, on or before the twelfth day of April, 1938, the sum of seventy-five thousand eight hundred sixteen dollars and twenty-nine cents ($75,816.29) with interest thereon at the rate of ten per cent. from September 21st, 1925, to December 20th, 1927, and thereafter at the rate of six per cent. to the date of payment; and the taxed costs of this appeal." *Page 466 
If therefore seems inferable that the Vice-Ordinary in advising the decree, considered and determined that the right to the accrued interest on the tax was also vested and that the statute was likewise ineffectual to exempt (remit) the accrued interest, as well as the principal tax. It is the decree, not the opinion, which received the unanimous affirmance of the Court of Errors and Appeals.
If, then, the rationale of the Voorhees Case forbids the annulment by the legislature of any pecuniary obligation, accrued, fixed and vested in the state and due from a private corporation to the state, is the distinction between "taxes" and "interest" legally significant, provided each is a statutory obligation?
In the absence of statute, a tax in its essential characteristics was not regarded as a debt, but rather an impost levied by authority of government in invitum upon its citizens or subjects. The payment of taxes could not be enforced by an action of debt. Thus, too, a tax did not carry interest. City ofCamden v. Allen. 26 N.J. Law 398.
Legislatures, of course, possess the power to declare that a tax shall be a debt, that the tax shall bear interest and that the tax and interest may be recovered by suit. Our legislature has so declared in respect of taxes payable by railroad companies. R.S. 54:27-4; N.J.S.A. 54:27-4. It will not be denied that accrued interest as well as the tax becomes one indivisible lien and merges in the "debt due from the company to the state." The legislative declaration that delinquent taxes shall "bear interest * * * until paid" necessarily connotes that the obligation to pay interest arises and grows with each day of delinquency and the lien of the state becomes correspondingly enlarged. This conviction is supported by an examination of other provisions of the statute. The reference to the obligation for which a lien is given embraces the accrued interest. R.S.54:27-6; N.J.S.A. 54:27-6. First, the section states that "the tax and interest thereon shall continue a lien on the franchise and property of the company * * * until paid by the company * * *." Secondly, it refers to proceedings taken by the Attorney-General to "enforce the payment of the tax and interest *Page 467 
thereon." The relationship between section 54:27-6 and section54:27-4 is obvious. The judgment to be summarily entered is for "the tax together with the interest due thereon." R.S. 54:28-1;N.J.S.A. 54:28-1. Significance must be ascribed to the clearly intelligible and declaratory words of the statute. It must be assumed that they were used purposefully. If so, can we hold that the tax is not a debt where the legislature has expressly declared that it shall be considered to be a debt? Can we resolve that interest is not a part of the debt when the legislature has explicitly ordained that it is? A corporation tax imposed by the statute (R.S. 54:12-1, et seq.; N.J.S.A. 54:12-1, et seq.) is likewise declared to be a debt due from the corporation to the state. R.S. 54:14-5; N.J.S.A. 54:14-5. So also, the contributions and interest due to the state by an employer under the Unemployment Compensation Act. R.S. 43:21-14, b; N.J.S.A.43:21-14, b; amended P.L. 1940 ch. 97.
In considering the pertinency of article I, section 20 of the constitution, I confess an inability to draw a line of reasonable distinction between one statutory obligation appertaining to taxes and another obligation of the same parentage respecting interest, although they may be referred to as separate and distinct obligations.
In Jersey City v. North Jersey Street Railway Co.,78 N.J. Law 72; 73 Atl. Rep. 609, Mr. Justice Swayze stated, (at p.74): "I cannot distinguish in principle between direct pecuniary aid and aid by means of a release from a pecuniary burden."
(Italics mine.)
The statutory obligation of railroad companies to pay interest upon their delinquent taxes was certainly a "pecuniary burden" which the railroad companies claimed was unbearable, and from which the legislature has endeavored to release them.
It is therefore apparent that the legislature has undertaken to aid some of the railroad companies by releasing them from "a financial obligation" and "pecuniary burden." It is not seriously proposed that the legislature can constitutionally remitinterest on taxes which has accrued and which has become a valid debt owing to the state. But it is said that *Page 468 
the essence and subjective character of the "obligation" and "burden" subverted by these statutes must be minutely and discriminately examined. The point is advocated that the millions of dollars chargeable to the defaulting railroad companies under the taxing statute as "interest" are in reality "penalties," and that the legislature may remit penalties.
Interest is a rate of per cent. of money payable for the forbearance of demanding payment of the debt. Webster'sInternational Dict. (2d ed.). Interest is the compensation allowed by law or fixed by the parties for the use, detention or forbearance of money or its equivalent. 30 Am. Jur. 6 § 2. The words "penal" and "penalty" have many different shades of meaning. A penalty is, of course, distinguishable from interest. A penalty is a means of punishment for default; interest is a means of compensation. 23 Am. Jur. 623 §§ 28, et seq. A parallel is found in punitive and compensatory damages at law.
The defendant concedes in his reply brief (page 36) that it is within the power of the legislature to attach interest to delinquent taxes as compensation for the consequences of the delay in payment.
"It is common knowledge that interest rates vary not only according to the general use value of money but also according to the hazard of particular classes of loans. Delinquent taxpayers as a class are a poor credit risk; tax default, unless an incident of legitimate tax litigation, is, to the eye sensitive to credit indications, a signal of distress. A rate of interest on tax delinquencies which is low in comparison to the taxpayer's borrowing rate — if he can borrow at all — is a temptation to use the state as a convenient, if involuntary, banker by the simple practice of deferring the payment of taxes.
"Another variable is the amount necessary to compensate for the trouble of handling the item. The legislature may include compensation to the state for the increased costs of administration in the exaction for delay in paying taxes without thereby changing it from interest to penalty." Meilink v.Unemployment Reserves Commission, 314 U.S. 564, 567.
In the present cause we are not gravely concerned with the abstract characterizations of interest on delinquent taxes. We *Page 469 
have here the concrete question whether our statute pertaining to the taxation of railroad companies (R.S. 54:27-4; N.J.S.A.54:27-4) has not so expressly annexed what it has chosen to call "interest" to the principal tax as to definitely make the interest a part of the "debt" which, having accrued, cannot be remitted without violating the broad interdiction of article I, section 20 of our constitution.
It must be acknowledged that interest does not inhere in a tax as a legal incident, but interest may be attached to a tax by legislative enactment. Our statute ordains that "such taxes, or the unpaid portion thereof, shall thenceforth bear interest."
The purpose of the legislature in adding this interest charge is not stated. But was it necessary to have interpolated the words "as compensation to the state for the delay in payment of such taxes?" A lien is granted. Was it not intended that the lien, or rather the obligation for which the lien was afforded, should include both the arrearage of taxes and the accrued interest? Continuing, "The lien * * * shall be a debt due from the company to the state * * * for which an action at law or suit in equity may be maintained, and shall be a preferred debt in case of insolvency." R.S. 54:27-4; N.J.S.A. 54:27-4.
In the matter of Senora Sinaloa Irrigation Co., 77 N.J. Eq. 42; 76 Atl. Rep. 307, it was resolved that interest at twelve per cent. upon franchise taxes due from a corporation was a part of the preferred debt.
The decisions rendered in Burlington County v. Martin,128 N.J. Law 203; 25 Atl. Rep. 2d 17 (Supreme Court), and129 N.J. Law 92; 28 Atl. Rep. 2d 116 (Court of Errorsand Appeals), should not be aggrandized to encircle issues not therein considered and determined. Mr. Justice Parker, who delivered the opinion for the Court of Errors and Appeals, imparted that the court based its affirmance upon the doctrine of contemporaneous construction of the statute and concluded that a contrary construction would "create disorder and confusion." The learned justice refers to the "interest thereon by way of penalty" and also to "interest or penalty," thus revealing that the appellate court did not erect its decision upon the fact that the interest was a *Page 470 
penalty. Nor did the Supreme Court determine that the interest was necessarily a penalty. The Chief-Justice remarked, "Interest or penalty, however one characterizes it, is not taxation but rather a punitive sanction for compelling timely payment of the tax. It is compensation for delay in payment." It is, of course, perceived that the legality of a remission of taxes or interest was not projected for adjudication in that case.
Decisions are found from the courts of other states which hold that under the statutes of those states interest on delinquent taxes is equivalent to a penalty. Many of these decisions are readily distinguishable in the fact that the statutes employ the word "penalty" or are otherwise unidentical with our own.
In Miller v. Lakewood Housing Co., 180 N.E. Rep. 700, 702,
the Supreme Court of Ohio stated: "Moreover, we do not lack for authority which holds that interest may be charged upon delinquent taxes as compensation for the use of money due the state. Thus Klein on Federal Income Taxation, pt. VI, page 1669, states that, `Interest merely furnishes compensation to the government for the loss of the use of the money subsequent to the time it lawfully became due.'"
In Sparks, Receiver, v. Lowndes County, 98 Ga. 284;25 S.E. Rep. 426, it was held, as epitomized in the syllabus: "In view of the act of November 11th, 1889 (Acts 1889, page 31), prescribing that all executions for taxes due the state or any county thereof shall bear interest at the rate of seven per cent. per annum from the time fixed by law for issuing the same, tax executions against railroad companies bear that rate of interest, and the law is applicable even as to taxes accruing and becoming due while the property of such companies is in the hands of a receiver. Such interest is not in the nature of a penalty."
The Chief-Justice, speaking for the court, in discussion of the question, stated: "We do not think the interest provided for by the act of 1889, supra, is to be regarded as a penalty. A penalty is a punishment, and interest is merely a compensation for the use or forbearance of money." *Page 471 
In the case of United States v. Childs, Trustee,266 U.S. 304; 45 S.Ct. 110, 111; 69 L.Ed. 299, the Supreme Court of the United States held the interest upon taxes claimed against a trustee in bankruptcy to be "not penal but compensatory," and Mr. Justice McKenna commented:
"At the outset we are confronted with the difference between penalty and interest. A penalty is a means of punishment; interest a means of compensation. Bouvier defines it to be `a consideration paid for the use of money or forbearance in demanding it when due.' * * *
"The tax in this case is one on income; a burden imposed for the support of the government. Interest is put upon it and so denominated, distinguished from the five per cent. as penalty, clearly intended to compensate the delay in payment of the tax — the detriment of its non-payment, to be continued during the time of its non-payment — compensation, not punishment."
In Meilink v. Unemployment Reserves Commission, supra, the petitioner sought to establish that the twelve per cent. exaction there in question was not "interest" by pointing out that it exceeded the uniform rate of interest. The United States Supreme Court observed: "We do not understand that as a matter of state law the California legislature was thereby forbidden to prescribe the higher rate here involved. And the mere difference in rates does not establish that the twelve per cent. rate is not interest * * *."
Obviously, the distinction between statutory "interest" and "penalty" is resolved by a proper construction of the statute by which the exaction is created and imposed. Louisville Car Wheeland Railway Supply Co. v. City of Louisville, 146 Ky. 573;142 S.W. Rep. 1043.
In United States v. Childs, supra, the United States Supreme Court suggested and adopted another diagnostic test to distinguish an interest charge from a penalty. Has the legislature in the revenue statute designated a fixed advalorem amount independent of time, or imposed a supercharge to be calculated by lapse of time? It is noticed that the act under consideration in the Meilink Case (Unemployment Compensation Act) provided that in the event contributions *Page 472 
were not paid when due, "There shall be added, as a part of the contributions, interest at the rate of one per centum permonth." (Italics supplied.) Our Railroad Tax Act (R.S. 54:27-4;N.J.S.A. 54:27-4) read "interest at the rate of one per cent. for each month * * *."
And so, we find in the decisions this super-addition to the tax variously denominated as "interest," "interest in the nature of a penalty," "penalty" and "compensation." Chapter 290 displayed originality in contributing the compound designation, "interest penalties," but it was promptly forsaken in chapter 291. Our statutes exhibit a distinctive and discriminative use of the words "interest" and "penalty." For examples: State Tax Uniform Procedure Law, R.S. 54:49-3; N.J.S.A. 54:49-3:
 "54:49-3. Interest on delinquent taxes.
"Any taxpayer who shall fail to pay any state tax on or before the day when the same shall be required by law to be paid shall pay in addition to the tax, unless otherwise provided in the law imposing such tax, interest on said tax at the rate of one per cent. for each month or fraction thereof that the same remains unpaid, to be calculated from the date the tax was originally due until the date of actual payment."
"54:49-4. Statutory penalties additional.
"In addition thereto such taxpayer shall pay any special penalty or penalties provided by the law imposing such tax."
Many others, such as: R.S. 54:23-4; N.J.S.A. 54:23-4; R.S.54:14-1, a, d and e; N.J.S.A. 54:14-1, a, d and e; R.S.54:31-15.17; N.J.S.A. 54:31-15.17, as amended by P.L. 1941ch. 20; R.S. 54:31-15.22; N.J.S.A. 54:31-15.22; R.S. 54:31-51;N.J.S.A. 54:31-51, as amended by P.L. 1941 ch. 21; R.S.54:32A-20; N.J.S.A. 54:32A-20; P.L. 1942 ch. 27. Words and phrases may very adequately and intelligently symbolize the reasoning pursued in the solution of one case, and yet be very confusing and misguiding in the consideration of another. It is always prudent to lift the label and examine the substance in its relation to the particular question to be answered.
The question here propounded is whether that which is to be remitted ($24,130,085.84) is a "financial obligation" or "pecuniary burden" owing to the state by a private corporation, *Page 473 
and one from which the private corporation cannot be constitutionally released. I think that our courts, particularly obligated as they are to liberally recognize and enforce prohibitory constitutional provisions, should not sanction the release of a pecuniary obligation due to the state from a private corporation under the implication that it is a "fine" or "penalty" unless such obligation is in its very essence indubitably a "fine" or "penalty."
Derelictions in the payment of taxes have existed since the earliest times. This state and its corporate subdivisions are obliged to pay interest on their loans in anticipation of the ultimate receipt of their tax revenues. Can it be imagined that it was intended that the state and its subdivisions were not to be reimbursed for that outlay? If the railroad is required to pay no more to the state for its delinquency than to a banking institution for the use of a like sum of money, it is feared that the railroad would in such a circumstance defer payment of its taxes and therefore it is argued that while some measure of the designated rate of interest is compensatory, another segment of it is of a coercive nature. Does the decision of this cause require a further refinement — to estrange that which is interest from that which is penalty? Every interest charge imposed by operation of law on a mature debt may be said to contain some coercive ingredient. The debtor is impelled to pay the debt at its maturity; otherwise he must not only pay the debt but the accrued interest thereon as well. The individual creditor is compensated for the deprivation of the use of his money. A "fine" or "penalty" is ordinarily imposed for derelictions of duties existing in favor of the public at large.
Unless cautiously controlled, fine-spun and technical exceptions and refinements soon devour the virtue of laws and constitutions. Unfortunately, few propensities have been more noticeable in recent years than the adroit endeavors to circumvent our laws and constitutions by some artifice or stratagem.
A reasonable and justifiable construction of the pertinent provisions of the Railroad Tax Act constrains me to conclude that the legislative intent was to oblige defaulting companies *Page 474 
to pay "interest" on their unpaid taxes and to impose a paramount lien upon all the lands, tangible property and franchises of the defaulting company to secure the payment of a debt comprising both the unpaid taxes and the accrued interest, and that upon default in the payment of taxes and the accrual of interest, the principal taxes and the accumulated interest should merge and constitute "a debt due from the company to the state * * *."
Apprehending that the rudimentary purpose of these statutes might be resolved to be an indirect appropriation of public funds to a private corporation blockaded by the decision in theVoorhees Case, the accessory contention is advanced by the defendant that the appropriation is contractual and supported by a legal, equitable or moral consideration. The retrospection dwells in our minds that the contract form was the convenient expedient customarily utilized in conferring financial aid to railroads or private enterprises preceding the adoption of the constitutional restraints. An outright and unconditional gift of public funds to a private corporation was not so much contemplated to occur then or now. It was feared that the inimical practice might be continued by the pursuit of some oblique or artful means. The insistence that the appropriation of the public funds to a private enterprise is contractual rather than donative has long been the fashionable plea.
Accordingly, it is expedient to attain a true conception of a consideration which effectually distinguishes an unconstitutional appropriation from a valid contract. It has been said, "Though a peppercorn may be sufficient consideration for a promise, whether or not it is, depends on whether it was in fact the exchange or at least a requested detriment induced by the promise. `Nothing is consideration * * * that is not regarded as such by both parties.'" Williston on Contracts 320 § 100. The existence of a binding contractual relationship between private parties is not the point to be here determined. The problem here to be solved is whether the evolvement of the legislature is in substance, purpose and effect an appropriation constitutionally prohibited.
The course of inquiry is outlined by the late Mr. Justice *Page 475 
Cardozo in McGovern v. City of New York, 234 N.Y. 377;138 N.E. Rep. 26, 32: "We are dealing here with a restraint imposedby the constitution itself upon the agencies of government. Its prohibitions are to be interpreted, not narrowly and grudgingly, like those of a penal statute (McCulloch v. Maryland, 4 Wheat.316; 4 L.Ed. 579; Prigg v. Pennsylvania, 16 Pet. 539, 612;10 L.Ed. 1060) but broadly and liberally to promote the policy behind them. A payment to a contractor does not cease to be extra compensation because some fragment of consideration, sufficient, it may be, to sustain a contract between private parties, may give to the transaction the aspect of an exchange of values. The underlying realities of plan and purpose and effect must prevail over the form or the disguise which may incumber or belie them. Approached in this spirit, the argument for the plaintiffs is seen to be beside the point. The argument is that courts do notweigh the adequacy of the consideration in determining whether anagreement has the obligation of a contract. Enough that a righthas been renounced. The renunciation supports the concession ofanything, no matter how large, that is offered in return. Thatmay be true if the existence of a contract is the only questionto be determined. What concerns us here is not whether a contractexists, but whether in substance and operation it is one forextra compensation, a largess in purpose and effect, though inname and in form a payment for money's worth. Cf. Matter ofOrvis's Estate, 223 N.Y. 1, 8; 119 N.E. Rep. 88; 3 A.L.R. 1636.
The constitution would be `a splendid bauble' (Marshall, C.J., inMcCulloch v. Maryland, supra, 4 Wheat. (at p. 421);4 L.Ed. 579) if its mandate could be evaded by the surrender of any right, however trivial or technical. In such matters,tendencies and consequences count for more than forms andnames." (Italics supplied.)
Assuredly, the requisite consideration must be unimagined, substantive and veritable.
Counsel for the defendant contend that the adequacy of the consideration is not a justifiable subject of judicial inquiry. Here, again, it must not be supposed that in the present cause the adequacy of an alleged consideration is to *Page 476 
be weighed as in the case of private parties merely to determine whether an agreement has the obligation of a contract. Patent inadequacy of consideration might be a salient and decisive factual circumstance in resolving whether legislation was in truth enacted in furtherance of a lawful contract, or manifestly in furtherance of a donative purpose prohibited by our constitution. Suppose, hypothetically, a statute purported to transfer one of the large and valuable institutional properties of the state to a private corporation for $10. The supposition is, of course, preposterous, but it serves to expound the relevancy of that bare circumstance in determining whether the proposed transaction was intended to be a sale or a donation.
True, in Morris and Essex Railroad Co. v. Newark, post, Vredenburgh, J., stated that whether there was an adequate or only partial consideration could not be a subject of inquiry, but it is observed that the court inquired into the consideration and concluded that it was a sufficient quid pro quo. In JerseyCity v. North Jersey Street Railway Co., supra, the court searched for the consideration, discarding the presumption in that regard normally accorded to a release under seal.
In the very recent case of State v. Roell, 7 So. Rep.
2d 867 (Mississippi, 1942), the court held that a conveyance of state-owned land for a grossly inadequateconsideration would clearly be in contravention of the constitution of Mississippi, prohibiting the donation to individuals or corporations of any of the lands belonging to the state. See, also, Slay v. Lowery, 152 Miss. 356;119 So. Rep. 819 (majority and dissenting opinions); State v. CincinnatiStreet Railway Co., 97 Ohio St. 283; 119 N.E. Rep. 735.
Specifically, what are the considerations presented by the defendant to support the legislative plan? First, it is proposed that the appropriation is in discharge of moral obligations which the people of New Jersey owed to the certain railroad companies so favored. This conception of the intrinsic object of the statutes is more fantastic than real. I am urged to conclude that in the economic emergency, the equally distressed individual taxpayers of the state owed a moral obligation to supply financial aid to certain railroad *Page 477 
companies. The intimation that an economic emergency annuls during its duration the provisions of our constitution is an egregious fallacy.
It is settled that the payment of a recognized moral obligation assumed for services rendered in the past in furtherance of a public purpose, is within the legislative power and its discharge does not constitute a donation of public funds. Morris and EssexRailroad Co. v. Newark, 76 N.J. Law 555; 70 Atl. Rep. 194;Cleveland v. Board of Finance, 38 N.J. Law 259; Rader v.Township of Union, 39 N.J. Law 509; Rutgers College v. Morgan,Comptroller, 70 N.J. Law 460; 57 Atl. Rep. 250; affirmed,71 N.J. Law 663; 60 Atl. Rep. 205.
But this doctrine is inapplicable to the circumstances of the present cause. What services had the railroad companies rendered? Apparently, the transportation of passengers and materials. For this advantage to the public welfare, the railroad companies received from the state, franchises embracing extraordinary rights and privileges. In return for their transportation operations, they received the fixed rates and charges from passengers and shippers.
In Stockton v. Central Railroad Co., 50 N.J. Eq. 52 (at p.71); 24 Atl. Rep. 964, Chancellor McGill stated, without affirming it to justify his conclusions: "Corporate bodies that engage in a public or quasi-public occupation are created by the state upon the hypothesis that they will be a public benefit. They enjoy privileges that individuals cannot have. Perpetual or certain life is accorded to them. Usually the authority of the right of eminent domain is delegated to them, often to be exercised in whatever locality they may be pleased to designate.National Docks, c., Railway Co. v. Pennsylvania Railroad Co.,24 Vr. 217. The use of the common highways is frequently subordinated to their operations, and, indeed, the individual is compelled, even in his own home, to submit without redress to discomforts incident to their lawful operation which he would not be required to tolerate from other sources. Beseman v.Pennsylvania Railroad Co., 21 Vr. 235; S.C. on Appeal, 23 Vr.221. Thus they are given special privileges because of the benefits they are presumed *Page 478 
to confer upon communities. Railways afford speedy and comfortable passage to and from divers parts of the country, carry produce of mines, farms and factories to markets, distribute industries throughout the land, feed the multitudes in populous cities, and accomplish many other beneficent ends. Water, gas, telegraph and similar corporations also render to the public benefits which readily suggest themselves to the mind as it contemplates their work. While the state confers special privileges upon these favorites, it at the same time exacts from them duties which also tend to the public welfare. The whole scheme of the laws of their organization is to equip and control them as instruments for the public good. Such corporations hold their powers not merely in trust for the pecuniary profit of their stockholders, but also in trust for the public weal. The impress for public good is stamped upon their very being, and it becomes a duty which, though not prescribed in express language of the law, is to be implied from the nature of every power conferred. When, therefore, it appears that such a corporation, unmindful of this plain duty, acts prejudicially to the public in order to make undue gains and profits for its stockholders, it uses its powers in a manner not contemplated by the law which confers them. The use becomes abuse, and is tantamount to excess of power."
More recently, Mr. Justice Parker, expressing the majority opinion of the Court of Errors and Appeals in O'Connor v.Board of Public Utility Commissioners, 129 N.J. Law 263;29 Atl. Rep. 2d 390, declared: "It is hornbook law that a public service corporation enjoying special franchises as a grant from the public in consideration of service to be performed for the public, having the right of eminent domain, and in the case of a railway, having the right of way at road crossings, must either exercise the franchise as required by law or surrender it."
At the moment of creating each railroad corporation, the payment of annual taxes at the legislative discretion was imposed by the state as the condition of existence and continued life of a railroad corporation. State Board of Assessors v. CentralRailroad Co., 48 N.J. Law 146, 152; 4 Atl. Rep. 578. *Page 479 
It is likewise elementary that doing or promising to do what one is already legally bound to do, is no consideration.Hasbrouck v. Winkler, 48 N.J. Law 431; 6 Atl. Rep. 22; Watts
v. Frenche, 19 N.J. Eq. 407; Marten v. Brown, 80 N.J. Law 143,145; 76 Atl. Rep. 1009; affirmed, 81 N.J. Law 599;80 Atl. Rep. 476.
An appropriation, directly or indirectly, by the state to a private corporation founded upon a transaction wherein a sufficient quid pro quo is not easily discoverable and justly ascertainable, is forbidden by article I, section 20 of our constitution. Rutgers College v. Morgan, 71 N.J. Law 663;60 Atl. Rep. 205.
It is elementary that unless the obligation is unenforceable, the payment by a taxpayer of that part of his liability which he is willing to discharge confers no benefit upon the state beyond that which it was already entitled to receive. I emphasize and reaffirm the absence of proof that the indebtedness of the railroads was uncollectible. Therefore the concession itself benefited the taxpayer and not the state.
It is suggested that a moral obligation rebounded from the idea that the railroads throughout the tax years 1932-1940 had been taxed excessively and oppressively. I fail to detect the trace of any such legislative conviction in the preamble of chapter 290. Its refutation is discovered in section 6 of chapter 290 and in section 7 of chapter 241, in which the legislature directed that should the companies default in their installment payments, the former tax indebtedness with interest shall be restored. It is not to be conjectured that the legislature would in the same enactment dictate the reinstatement of tax obligations deemed unconscionable. Moreover, no such alleged moral obligation noticeably arose in favor of the companies which had paid their taxes.
It is pretended that "the probability (in the future) of bankruptcy proceedings by other railroad companies" formed another moral consideration for the remission of the accumulated interest charges. This is capricious. If a financial donation of public funds can be lawfully made to a privately owned utility corporation to emancipate it from "probable bankruptcy," then the pertinent restriction in our constitution *Page 480 
is a mere whimwham. From a financial point of view, the state in the case of railroads, had a paramount lien securing, even in insolvency, its preferred debt inclusive of both taxes and interest. R.S. 54:27-4; N.J.S.A. 54:27-4; Meilink v.Unemployment Reserves Commission, supra.
Another purpose introduced by the defendant as a moral consideration for the legislative action is "The fostering of safe and efficient management thus enabling railroads to meet the transportation demands of the present emergency." I take this to mean the fostering of "private management."
The adoption of these constitutional provisions akin to ours throughout the country did not alter the basic premise that the promotion of transportation is a public purpose for which public funds may be expended. These constitutional amendments were, however, directed at the means of effectuating that publicpurpose. They were intended to prevent the accomplishment of that purpose by the means of aid to private corporations notconstituting public agencies controlled by the state. This important distinction is stated with clarity by the New York Court of Appeals in People v. Westchester County NationalBank, 231 N.Y. 465; 132 N.E. Rep. 241 (1921), where it was said (at p. 244):
"Whether the purpose is a public one, therefore, is no longer the sole test as to the proper use of the state's credit. Such apurpose may not be served in one particular way. Howeverimportant, however useful the objects designed by thelegislature, they may not be accomplished by a gift or a loan ofthe credit to an individual or a corporation. It will not do to say that the character of the act is to be judged by its main object — that because the purpose is public, the means adopted cannot be called a gift or a loan. To do so would make meaningless the provision adopted by the convention of 1846. Gifts of credit to railroads seemed an important public purpose. That purpose was distinctly before the legislature that made them. Yet they were still gifts and so were prohibited." (Italics supplied.)
In our own state, the decisions in Rutgers College v.Morgan, supra; Trustees of Newark Free Public Library v. CivilService Commission, 83 N.J. Law 196; 83 Atl. Rep. 980; *Page 481 affirmed, 86 N.J. Law 307; 90 Atl. Rep. 261; Romano v. HousingAuthority, Newark, 123 N.J. Law 428; 10 Atl. Rep. 2d 181;affirmed, 124 N.J. Law 452; 12 Atl. Rep. 2d 384, are similarly elucidative.
But where public ownership is also attended by other features which themselves constitute violations of these constitutional provisions, the courts have not hesitated to declare such arrangements to be void. Atkinson v. Board of Commissioners ofAda County, 108 Pac. Rep. 1046; Taylor v. Commissioners of RossCounty, 23 Ohio St. 22; Wyscavar v. Atkinson, 37 Ohio St. 80;Lord v. City and County of Denver, 58 Colo. 1;143 Pac. Rep. 284; Hunter v. City of Roseberg, 80 Or. 588;156 Pac. Rep. 267.
In the instant case, the railroad companies are privately owned corporations operated exclusively for private gain. There is no evidence whatever that these railroad companies have assumed in return for the financial aid so tendered, any new contractual obligation to improve or augment their transportation service beyond that which they were already under a duty to render.
Furthermore, it is argued that the abatements and remissions are supported by a legal consideration, distinguishable from a moral or equitable one. This legal consideration is said to be found in the promise of the railroad companies (1) to discontinue all tax appeals pending before the state tax board, (2) to abandon further rights of appeal in respect of decisions already rendered by the board, (3) a waiver of the right to question the validity or amount of 1941 assessments under the new statutes, and (4) an assumption of liability by the operating companies of the various railroad systems of the unpaid tax obligations of the individual railroads operated in New Jersey as part of such systems.
The inclination to discuss this point in proportion to the study devoted to it cannot be appropriately gratified. The field of inquiry has embraced (a) the history of the so-called tax litigation, with which the legislature was presumably acquainted; (b) the numerous issues already considered and definitely adjudicated by the courts; (c) the conclusive nature of the judicial sanctions of the methods of assessment *Page 482 
and valuation pursued; (d) the number of appeals remaining available to the railroad companies, the reductions claimable and their prospect; and (e) the pecuniary benefit suggested as likely to accrue to the state, in comparison with the huge sum of interest to be voluntarily remitted. Did the covenant to abandon tax appeals achieve the magnitude and intensity of a "legal consideration" or was it merely an incidental condition?
Mr. Justice Perskie remarked in 1934 that "almost every possible phase of this litigious question [railroad taxation] has been brought to our courts [it is estimated that it has been so brought in excess of one hundred times] and received their consideration * * *." Central Railroad Co. v. Thayer Martin,114 N.J. Law 69 (at p. 73); 175 Atl. Rep. 637. In LehighValley Railroad Company of New Jersey v. State Board,100 Fed. Rep. 2d 139, 143, it was stated: "Nonetheless the methods of assessment and valuation employed in the case at bar have received the sanction of the courts of New Jersey and are now firmly embodied in its laws." See, also, Central RailroadCompany of New Jersey v. Martin, 115 Fed. Rep. 2d 968
(C.C.A. 3d 1941); certiorari denied.
A half century of litigation concerning the subject inevitably drained the supply of reasonably controversial questions. On July 22d 1941, the date of the adoption of chapter 290, the only tax appeals theretofore instituted which remained susceptible of further prosecution were those relating to taxes for the years 1937-1941, inclusive. The 1937 and 1938 appeals then had been adjudicated by the State Board of Tax Appeals. There was, however, the right to apply to the Supreme Court for writs ofcertiorari. The fundamental methods of valuation remained substantially identical for the years 1931-1941.
It is significant to understand that these appeals were not in the nature of affirmative actions against the state, but defensive in purpose. The companies resisted the collection of the taxes by the prosecution of the appeals. Meanwhile, the state was losing the use of the taxes and thereby incurring expense. Its compensation was the accruing interest. Most *Page 483 
of the appeals (1931-1936) had been determined conclusively. It is at once noticeable that $24,000,000 is an enormous sum to pay to induce some of the many railroad companies to abandon tax appeals so rigidly restricted in scope. Is it to be reasonably and logically believed that it was purposed to remit all of the compensatory charges which had accrued during the years of litigation as a consideration for the discontinuance of the remaining appeals?
As of July 22d 1941, when chapter 290 was adopted, the New York, Ontario and Western Railroad Company, although it had no appeals pending, or rights to appeal whatever, nevertheless received an abatement of $3,165.72 under the operation of section 4 of chapter 290. Thus, also, the Reading Company, with potential cash savings on pending appeals of $727,315.08, could qualify for an abatement of only $22,678.91 of interest owing. On the other hand, The Central Railroad Company of New Jersey is offered an abatement of $7,555,531.97 under section 4, as contrasted with potential savings on its then pending tax appeals of $5,951,395.86, and the New York, Susquehanna and Western System receives an abatement of $521,125.91 in return for the discontinuance of appeals involving a potential saving of $365,952.22.
It is to be observed, moreover, that the Pennsylvania Railroad Company, which had appeals pending at that date, involving a potential aggregate tax saving of $8,273,029.79, and the Penn-Reading Seashore System, which had appeals of a potential value of $1,037,670.67, could not obtain any financial return for the discontinuance of those appeals under chapter 290, because no part of the interest owing by them was abatable under the operation of section 4. The total interest liability of these roads at that date was respectively, $4,386.31 and $678.05.
A reason for the cessation of litigation is reflected in section 15 of chapter 241: "It is essential that the railroads in this state be not financially harassed by the continued attempt to collect statutory interest penalties with respect to the taxes assessed for the tax years involved." *Page 484 
The informant submits that assuming there were fragmentary benefits which might ordinarily be recognized as considerations, though inadequate, yet the unlawful endeavor to grant excess financial aid to the railroads so contaminates all the consolidated considerations as to destroy their validity and effectiveness. The doctrine is familiar that where there are a number of interwoven considerations, and one of them is illegal, the entire agreement is avoided by reason of the impossibility of estimating and allocating the weight which the void portion may have had as an inducement to the contract. Lehigh ValleyRailroad Co. v. United Lead Co., 102 N.J. Law 545;133 Atl. Rep. 290; Kenney v. Paterson Milk and Cream Co.,110 N.J. Law 141; 164 Atl. Rep. 274.
True, it is impossible to calculate how much of this generous remission of accrued interest was made in return for the abandonment of tax appeals and how much was intended to spare certain railroads from "the probability of bankruptcy proceedings" and to foster "safe and efficient management" of the railroads and to enable "railroads to meet the transportation demands of the present emergency," and to liberate them from being "financially harassed." The latter are represented by the defendant to be considerations for the proposed compact. (Defendant's brief, pages 92, et seq.) The following cases are particularly pertinent. Higgins v. City of San Diego, 118 Cal. 537; 45 Pac. Rep. 824; Garland v. Board of Revenue ofMontgomery County, 87 Ala. 223; 6 So. Rep. 402.
Courts must always be alert to detect and suppress all evasions of constitutional interdictions. Thus, the determination of the basic questions in the present cause ought not to rest so much upon technicalized reasoning as upon a circumspect and enveloping comprehension of the effect of these statutes.
Manifestly, the impelling reason or consideration for the enactment of this legislation was to lighten the then-existing pecuniary liabilities of the defaulting railroads, thereby financially rehabilitating them to the end that they should continue their full usefulness to the public and resume contributions, at least in periodic installments, to the revenues *Page 485 
of the state. Not the policy, but the power of the legislature, is here challenged.
The paramount object desired to be attained was of course resolved before the introduction of chapter 290. The preamble of chapter 290 distinctly reveals the fundamental reasons which motivated the granting of financial aid to the railroads.
"WHEREAS, Four of the railroad systems serving this State are or have recently been in reorganization under Federal bankruptcy laws, and there is serious doubt as to the ability of therailroads operating in the State to pay the delinquent taxes, andat the same time to continue to furnish adequate and safeservice; and
"WHEREAS, The limited area of New Jersey and its intensive industrial development make it peculiarly dependent upon efficient transportation, particularly because of the present demands of production for national defense, and immediatepayment of accumulated tax delinquencies would impair thecapacity of the delinquent railroads to furnish suchtransportation service;
"* * * the entire State has an urgent and important interest in * * * the maintenance of stable transportation facilities * * *."
The court cannot disclaim knowledge of that which is generally known. Chapter 290 encountered the attack of the Attorney-General on constitutional grounds. It is indubitable that chapter 241 was skillfully and proficiently redacted to rescue chapter 290 from its alleged and seriously apprehended constitutional impotence. Section 15 is the arsenal of defense, and yet, in it a solicitude for the railroads continues to be discernible in the following excerpts:
"The development of competitive transportation facilities, the more general use of fuels other than coal, the shrinkage of export rail traffic destined to the port of New York, the decentralization of industry and other causes, as well as the economic depression of the past decade, adversely affected the financial position and progress of the railroads operating in New Jersey, and although the income of such railroads was substantially decreased from the former levels, the tax obligations of such railroads were not materially reduced.
 * * * * * * *
"To meet the existing national emergency and aid the effectivemovement of armed forces and supplies, so that this state and the nation may be protected, it is essential that the railroadsin this state be not financially harassed by the continued attempt to collect statutory interest penalties with respect to the taxes assessed for the tax years involved." *Page 486 
Whether a given motivation for legislative action is denominated a consideration, a reason or a legislative purpose or object, the substantial question is whether such legislative action essentially constitutes an appropriation of money to or for the use of a private corporation within the signification and intendment of article I, section 20.
In the existing state of the proofs, I must reject the contention that the legislative action was of a contractual character. If the legislature was in fact bargaining for a compromise settlement of pending and prospective tax appeals, the appropriation to each railroad would certainly have been measured by the value of its particular appeals. There is evidence before me that with the exception of the Reading Company, the Penn-Reading Seashore Lines and the Pennsylvania Railroad Company, the amount of interest abated exceeded the total potential recovery of the company from its appeals. This lack of correlation between the price indirectly paid to each of these railroads and the value of its appeals clearly portrays that the discontinuances and waivers were not intended to constitute the consideration of a contract. The characteristics of a bargain are not observable. The abandonment of appeals does not rise above what may be more appropriately distinguished as an incidental condition of the public grant.
Likewise there is no reciprocity between the actual financial need of a railroad to enable it to render service and the amount of its indebtedness which was canceled. It is not pretended, for example, that systems such as the Erie, the New York Central, the Reading or the Pennsylvania, all of which might, under the terms of chapter 241, have chosen to qualify for remissions of accrued interest, were not financially capable of discharging their financial obligations to the state and also continuing their transportation operations. The Central Railroad of New Jersey is an example of a company which was in difficulties. Remissions of interest were accorded the companies irrespective of their ability to pay taxes and without regard for their capacity to continue service. Such a lack of balance is not ordinarily conspicuous in a contractual engagement. *Page 487 
Courts should not gradually emasculate or whittle away the beneficent provisions of the supreme law. Constitutional provisions, protective and remedial in their nature, are not to be construed so stringently as to defeat the intended protection or remedy. Such regulatory provisions deemed to be of sufficient importance to the welfare of our government as to be incorporated in our constitution, must be interpreted to accomplish effectively and comprehensively the purposes for which they were introduced. If, when so interpreted, a legislative enactment is not fairly susceptible of a construction consistent with such provisions, it becomes the inescapable duty of the court to recognize and declare its invalidity.
To declare a statute unconstitutional is a judicial power to be delicately exercised. The exercise of that power has been entrusted to the courts. There it has been for generations, and there it must remain until the people in a constitutional manner lodge it elsewhere. The responsibility must be fearlessly assumed.
It will be remembered that it was the extension of public credit and financial aid to private corporations such as railroads that occasioned the general adoption of constitutional provisions such as article I, section 20. This evil was a topic of national discussion, written about by publicists, denounced by the press, and resolved about by political parties. The story is still too familiar to require reiteration. The purpose of the constitutional restraint was to completely eradicate, and to eternally suppress, any recurrence of this evil, whatever might be its future characteristics or disguises. That such constitutional provisions were intended to prevent the granting of financial gratuities by any possible means to privately owned railroad corporations is the firm conclusion of a veritable legion of authorities.
The public importance of this cause has inspired me to subject it to a more extensive study than ordinarily would be required in the decision of the pending preliminary application. TheVoorhees Case has been exceedingly influential in my deliberations. The proofs submitted to me, the controversial points, the pertinent decisions and the arguments of counsel have all been earnestly and thoughtfully considered. *Page 488 
Therefore, I feel prepared to express the opinion that the interrelated statutes (chapter 290 and chapter 241) are in purpose and effect violative of article I, section 20 of our state constitution.
There has been, and is, an increasing demand for public and governmental aid. I conscientiously apprehend that a decision contrary to that at which I have arrived, and possessing sufficient elasticity to confirm the validity of these statutes, would leave the door ajar for other subtle evasions of our constitutional restrictions.
In view of my conclusion, it is unnecessary for me to express an opinion concerning the other particulars in which the constitutionality of the statutes is impugned.
An order will be advised continuing the existing restraint until final hearing.