NOVEMBER TERM, 1876.

THE ATTORNEY-GENERAL, appellant, and THE DELAWARE AND BOUND BROOK RAILROAD COMPANY, respondent.

1. The Attorney-General has the right, where the property of the sovereign or the interests of the public are directly concerned, to institute suit for their protection, by an information at law or in equity, without a relator.

2. In a conveyance, by the sovereign, of property which is usually the subject of private ownership, the extent of the thing granted is to be ascertained by the rules of construction applicable to private deeds.

3. The bed of the Delaware river above tide-water, from the easterly bank *ad filum medium aquæ,* passed by the grant from Charles II. to the Duke of York, dated March 12th, 1664, and is private property.

4. The general railroad law, approved April 2d, 1873, provides for conferring the franchise of bridging the Delaware, so far as the authority of New Jersey can avail for that purpose.

5. When Pennsylvania has authorized one of its railroad corporations to bridge the Delaware so as to connect with any New Jersey road, and New Jersey has authorized one of its railroad companies to bridge the Delaware so as to connect with any Pennsylvania road, the states have exercised concurrent jurisdiction under the treaty of 1783, in such manner as to give mutual consent to the erection of a bridge by the New Jersey and Pennsylvania companies jointly, each from its own bank to the centre of the stream.

The case, in the Court of Chancery, is reported *ante, p.* 1.

*Mr. Vanatta,* Attorney-General, and *Mr. Cortlandt Parker,* for appellant.

*Mr. B. Williamson* and *Mr. Browning,* for respondent.

The opinion of the court was delivered by

Dixon, J.

The Attorney-General filed an information in the Court of Chancery for the purpose of restraining the Delaware and Bound Brook Railroad Company from completing a bridge which it was constructing over the waters of the river Delaware, and of abating the piers and abutments which it had already erected, upon the ground that the bridge, piers and abutments were and would be a purpresture and public nuisance. Upon a rule to show cause why the prayer in the information should not be granted, the defendant filed its answer, and at the hearing, the Chancellor discharged the rule and dismissed the information. From this order the Attorney-General presents his appeal to this court.

Both below and here the defendant urged that the information is, at least, irregular for want of a relator, and should not be permitted to stand, unless amended by the insertion of the

name of a proper person as such. But this objection must not prevail. In equity, as in the law court, the Attorney-General has the right, in cases where the property of the sovereign or the interests of the public are directly concerned, to institute suit, by what may be called civil information, for their protection. The state is not left without redress in its own courts because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer, on whom it has cast the responsibility and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the courts on such questions of public moment. The same point was lately raised in the Supreme Court, (*Attorney-General* v. *Del. & B. B. R. R. Co.*, 9 *Vroom* 282,) and there decided in accordance with the views of the Chancellor and this court in the present case.

The first position taken by the Attorney-General in support of his prayer is, that the bridge in controversy stands upon the land of the state, to the occupancy of which the defendant has no title. The want of title from the state is conceded; but that the land is the property of the state, the defendant denies. The bridge is being erected across the Delaware river from a point in the township of Ewing, Mercer county, New Jersey, to a point in the township of Lower Makefield, Bucks county, Pennsylvania, and rests upon piers standing in the bed of the river. This part of the river is above the ebb and flow of the tide, which does not pass beyond the falls of Trenton, some few miles below; and the claim on behalf of the state is, that before the revolution, the crown, and since the revolution, the state, as sovereign, has been proprietor of this and all other portions of the bed of the Delaware river.

Both parties admit that prior to March 12th, 1664, the title was in the King of England. On that day, Charles II. issued to his brother James, Duke of York, letters patent, by which he granted unto the duke, his heirs and assigns, to be held of the king, his heirs and successors, in free and common socage, a large territory in America, one tract of which is therein described as " the said river called Hudson's river, and all the

lands from the west side of Connecticut to the east side of Delaware bay, * * * together with all the lands, * * * * rivers, * * * * waters, lakes, * * * and all other royalties, * * * to said several * * * lands and premises belonging and appertaining." These letters also conferred upon the duke, his heirs and assigns, certain powers of government, to be exercised over said territory and its inhabitants, reserving, however, the sovereignty of the king. *Leaming & Spicer, p.* 3.

Under this grant, it is insisted that the easterly margin of the Delaware bay and river, throughout its entire length, is the westerly boundary of the land conveyed; that the words, "the east side of Delaware bay," especially in a grant from the crown, cannot, by construction, be extended below high-water mark; that their use shows the intention of the king to reserve all the land under water in the bay and river.

Several suggestions seem to me pertinent to the proper interpretation of this grant.

While these letters patent were indeed issued to a subject, that subject was the chief subject of the realm, and the heir presumptive to the throne. The purpose of the king was not the mere grant of private interests, but the establishment of a commonwealth, with ample powers of local government and defence. That no special reason existed in the royal mind for not parting with the title to the bed of streams, so far as that title could legally be separated from sovereignty, is made clear enough by the fact that the great Hudson river is expressly granted, as also all the other rivers within the territory described; and I think no motive can be suggested for the retention of the bed of the Delaware, which would not apply with equal force to the Hudson and Raritan. Indeed, prior to 1648, letters patent had been issued, embracing the whole of this river and bay, in the province of New Albion. There is, therefore, no antecedent presumption against the grant of the river.

And looking at the very words of the conveyance, " the east side of Delaware *bay*," what is observable? A bay is an

arm of the sea, distinct from a river. And it is certain that in 1664, Charles and his advisers could not have been under the impression that the whole of the Delaware was a bay. In 1648, persons interested in the encouragement of emigration to New Albion, had published, in England, a circular embracing a letter from Robert Evelyn, in which he describes a trip up the Delaware, or Charles river, to a point about thirty miles above the falls, which, he says, were about sixty-five leagues from the sea. He writes that no part of Delaware bay extended as far as the fortieth degree of north latitude, but that a ship of one hundred and forty tons might go up to the falls. *Smith's History of New Jersey, p.* 28, *note.*

For years before the date of these letters patent, the shores of the southerly portions of the Delaware had been inhabited by English, Swedes, and Dutch, and doubtless the adventurous spirit of the times had carried many others besides Evelyn among the Indian kings that hunted along its northerly banks : and it would be difficult to believe that, in spite of the curiosity about the American settlements which pervaded all classes of Europeans, in spite of the peculiar interest which the King and his councilors would feel regarding them, not only while he was upon the throne, their actual possessor, but while he lingered about the courts of the continent, pondering upon the extent and value of those realms he owned but could not occupy, the royal advisers were ignorant of the existence of a river north of, and emptying into, Delaware bay.

It seems to me, therefore, that although the very words might limit the grant to the east side of Delaware bay, so far as it is a bay, yet beyond that, the westerly boundary, even as the whole of the northerly boundary of this tract, is matter of inference, not of expression.

The words, then, being inconclusive as to the boundary along the river, much light may, I think, be thrown upon the subject by ascertaining the practical interpretation which, in those early times, was placed upon the grant.

By lease and release, dated June 23d, 24th, 1664, less than four months after the king's patent, the Duke of York con-

veyed to Carteret and Berkeley, their heirs and assigns, a tract of land which they regarded as included in the king's letters, and which they described as "bounded on the east, part by the main sea, and part by Hudson's river, and hath upon the west, Delaware bay or river, and extendeth southward to the main ocean, as far as Cape May, at the mouth of Delaware bay; and to the northward, as far as the northernmost branch of the said bay or river of Delaware, which is forty-one degrees and forty minutes of latitude." *Leaming & Spicer, p.* 8.

These deeds do not limit the territory by the *side* of the river; and although James was the grantee, not the grantor, of the original conveyance, yet he was expecting the inheritance of the grantor's estate, with all its rights and prerogatives unimpaired, and he does not stand in history as a prince wont to abate any jot of regal claim, either before or after his own coronation. In these deeds, it is provided that the tract of land granted shall thereafter be called New Cæsarea, or New Jersey; and Charles, in a letter of December 9th, 1672, to the deputy governor of the province of New Jersey, speaks of his having granted the propriety thereof to Berkeley and Cateret, obviously referring to and approving the title to the entire territory derived through the Duke of York. *Leaming & Spicer, p.* 38.

I refer, also, to the following instruments, as indicating the Delaware river, and not the east side of the river, as the westerly boundary of the province of New Jersey, and recognizing as valid the title of the proprietors to the whole province so bounded: the lease and release of July 28th, 29th, 1674, from the Duke of York to Carteret, (*Leaming & Spicer, p.* 46); the king's letter of June 13th, 1674, for the encouragement of the settlement of the province, (*Leaming & Spicer, p.* 49); the quinquepartite deed between Carteret, Penn, Lawry, Lucas and Billinge, dated July 1st, 1676, dividing the province into East and West New Jersey, (*Leaming & Spicer, p.* 61); the grant from the Duke of York to Penn and others, for West Jersey, dated August 6th, 1680, (*Leaming & Spicer, p.*

141); the Duke of York's release to the twenty-four pro-
prietors of East Jersey, dated March 14th, 1682–3, and the
the king's confirmation of this release, dated November 23d,
1683, (*Leaming & Spicer, p.* 151.) And it may be affirmed
of the memorials preliminary to the surrender to Queen Anne,
in 1702, of the surrender itself, and of the instructions there-
upon issued to Lord Cornbury, that they all, without nicer
specification, refer to the grant of the Duke of York as being
fully warranted, so far as territory was concerned, by the
letters patent of the king.

I think, therefore, that to restrict the king's grant to nar-
rower limits than those indicated by the lease and release of
the Duke of York, is sticking in the bark, and ascribing to
the conveyance a meaning which neither of the parties to it,
nor any, in early times, claiming under either of them, con-
sidered or acted upon as a just interpretation.

The question then arises as to the effect of a grant by the
king of lands bounded upon a river. As early as the second
year of Henry VII. it was resolved that the king's grant
should pass nothing by implication. 2 *Henry VII.* 13. And
in the case of the *Royal Fishery of the Banne*, (*Davies* 149,) the
Chief Judges of the Privy Council, applying this principle,
considered that letters patent, granting the territory of Rout
adjoining to the river Banne, and all fisheries in or within
said territory, except three parts of the fishery of the river
Banne, did not convey to the patentee the fourth part of this
fishery below tide-water, for they said, the Banne is a naviga-
ble stream where the tide ebbs and flows, and the fishery in
it is a royal fishery, which is not appurtenant to land, but is
a fishery in gross, and parcel of the inheritance of the crown
by itself, and general words in the king's grant shall not pass
such special royalty. But the same judges, in the same case,
also resolved that in every river where the tide did not ebb
and flow, and in the fishery of such river, the ter-tenants on
each side have an interest of common right; and every such
river appertains to the owners of the soil where it hath its
course, and if such river runneth between two manors and is

the boundary between them, the one moiety of the river and fishery belongs to one lord, and the other moiety to the other. Lord Hale, in his treatise de jure maris, (of which it is said that, "in England, the courts scan his words with as much care as if they had been found in Magna Charta; and the meaning once ascertained, they do not trouble themselves to search any further,") says, (*ch.* 3,) "There be some streams or rivers that are private, not only in propriety or ownership, but also in use, as little streams and rivers that are not a common passage for the king's people. Again, there be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters; and these, whether they are fresh or salt, whether they flow and re-flow or not, are, prima facie, *publici juris,* common highways for man or goods, or both, from one inland town to another. Fresh rivers, of what kind soever, do, of common right, belong to the owners of the soil adjacent; so that the owners of the one side have, of common right, the property of the soil, and consequently the right of fishing, *usque ad filum aquæ;* and the owners of the other side, the right of soil or ownership and fishing unto the *filum aquæ* on their side." (*ch.* 1.)

The same principle was declared in *Carter* v. *Murcot,* 4 *Burr.* 2163, where it was said, "In rivers not navigable, the proprietors of the land have the right of fishery on their respective sides, and it generally extends *ad filum medium aquæ.* The cases cited prove this distinction, 'that navigable rivers or arms of the sea belong to the crown, and not (like private rivers) to the land-owners on each side.'"

In *Tyler* v. *Wilkinson,* 4 *Mason C. C.* 397, Story, speaking of the Pawtucket, above tide-water, says : "Prima facie, every proprietor on each bank of a river is entitled to the land covered with water in front of his bank, to the middle thread of the stream."

In *Arnold* v. *Mundy,* 1 *Halst.* 1, Chief Justice Kirkpatrick declares the law to be "that a grant of land *to* a subject or citizen, bounded upon a fresh water stream or river, where

the tide neither ebbs nor flows, extends to the middle of the channel of such river."

In *Cobb* v. *Davenport*, 3 *Vroom* 369, the notion that actual navigability was the criterion of public or private ownership in the bed of waters, was distinctly repudiated, and the doctrine that the ebb and flow of the tide furnished such criterion was expressly adopted, as a principle of the common law so well settled that a citation of authorities was deemed unnecessary.

Inasmuch, then, as upon this principle of the common law, which was established in England at the time of the king's grant to James, and which was brought to and adopted in this state, the bed of non-tidal waters was a species of private property, and not a royalty of the crown, it seems to me that the question, whether by that grant the bed of the Delaware above tide was conveyed or not, is to be resolved by the application of those rules of construction which ordinarily discover to courts the meaning of persons dealing with such property. Among those rules, none, I think, is more firmly settled than this, that grants of land bounded upon or along rivers above tide-water, carry the exclusive right and title of the grantee to the centre of the stream, unless the terms of the grant clearly denote the intention to stop at the edge or margin of the river. 3 *Kent* 427; *Winter* v. *Peterson*, 4 *Zab.* 524; *Railroad Co.* v. *Schurmeir*, 7 *Wall.* 272, 287. As to these letters patent of the king, there is nothing, either in the words of the grant, the evident purpose which induced it, or the policy of the law that controlled it, to indicate such intention, and therefore, I think, that under those letters, the Duke of York and his grantees took the ownership of the bed of the Delaware above tide-water to the thread of the river, as private proprietors. They have received the same construction in the highest court of the land. In *Rundle* v. *Delaware and Rar. Canal Co.*, 14 *How.* 80, Justice Grier, delivering the opinion of the court, said: "The river Delaware is the well-known boundary between the States of Pennsylvania and New Jersey. Below tide-water, the river,

its soil and islands, formerly belonged to the crown; above tide-water, it was vested in the proprietaries of the co-terminous provinces, each holding *ad medium filum aquæ.*"

In the following, among many other American cases, the same rule of construction has been applied to grants by the sovereign : *Ex parte Jennings,* 6 *Cow.* 518, (*note ;*) *Middleton* v. *Pritchard,* 3 *Scamm.* 510 ; *Jones* v. *Soulard,* 24 *How.* 41, where counsel cites a long array of apposite cases.

Upon this theory of private title to the bed of the stream, the proprietors and the riparian owners under them, doubtless acted from a very early period. By the instrument called "The concessions and agreements of the proprietors, freeholders, and inhabitants of the province of West New Jersey, in America," dated March 3d, 1676–7, it was granted that "all the inhabitants within the said province of West Jersey have the liberty of fishing in Delaware river." *L. & S.* 390. If the bed of the river had remained the property of the crown, the right of fishing therein would have been common, and no grant from the proprietors would have been needed or effectual ; but if the title to the bed were vested in private owners, then the fishery would have become several (2 *Black. Comm.* 39), and could be lawfully enjoyed by the public only after some such act of dedication as these concessions contain. Upon this grant, I think, rests the claim which the people of the commonwealth have always maintained to regulate and control the fisheries of the river above tide-water.

As early as 1683, the assembly of West Jersey provided for treating with the proprietary of Pennsylvania in regard to the rights and privileges of the province to or in the Delaware river, (*L. & S.* 480) ; and on December 21st, 1771, (*Allinson* 347), an act was passed concurrently with a similar Pennsylvania statute, which declared the Delaware to be a common highway for the purposes of navigation, and provided for improving the navigation between Trenton and Easton, by removing obstructions and widening and deepening the channel, but also provided for the preservation of

Hoop's dam, on the Pennsylvania side, and such other dams as had been theretofore erected. This legislation thus, while it declared that the river, above tide, belonged to that class of streams which Hale describes as of common or public use as highways, though private in propriety or ownership, yet refrained from interfering with those private structures which had been placed upon the bed before such authoritative declaration was made.

Of this class, then, is the Delaware river above the tide: the title to the bed is in the private owner, but is subject to the paramount public right to use the river as a common highway, in which is included the right to so control and change the bed as to preserve and improve the navigability of the water.

Against the conclusion which I thus reach, stands, it is said, the opinion of the crown lawyers, Raymond and Yorke, both afterwards Chief Justices of England. This opinion was given in 1721, upon a question as to whether the title to the islands in the Delaware had passed from the crown under the provincial charters of Pennsylvania and New Jersey. They answered that it had not. They give no reasons, nor in any way indicate how they arrived at that decision. *Chal. Col. Op.* 90. The islands in dispute were probably islands in tide-water, since so early as 1721, the islands above Trenton were hardly worth contending for; and this extrajudicial opinion is certainly not entitled to more force than the decision of a court would receive—force within the class of subjects to which it relates; it cannot be viewed as an authority on the title of the islands above the tide.

Nor is *Den* v. *White, Coxe* 94, such an authority. The court there held only that the lessor of the plaintiff, who claimed under neither the king nor the proprietors, had not shown any other title. Some expressions of the Chief Justice to the jury indicate, indeed, that the defendant's contention, that at all events the plaintiff must fail, because the title was in the crown, had met with his acquiescence, but that was not

a deliberate conviction upon a point litigated and necessary to or involved in the decision of the cause.

There is also pressed upon our attention the opinion of Richard Stockton, given in 1828, in reference to the right of New Jersey to make a canal without obtaining the consent of Pennsylvania to use the waters of the Delaware. In that opinion, he states this position as believed to be undeniable: "The river Delaware was not included in the ancient grants of the King of England and the Duke of York, either to the proprietors of New Jersey or to William Penn, the proprietor of Pennsylvania, but the property therein and its islands remained in the crown of England until the Revolution. The rights of private property claimed by individuals on either side of the river, had no other legal foundation but occupation or possession." It is evident that this proposition, as distinct from the idea that the title of the bed above tide was in private owners, was in no wise relevant to the inquiry before him, whether the consent of the sister state was necessary to the lawful use of the water. Pennsylvania would have no more control of the water running over lands of private proprietors than if it ran over the public lands of New Jersey. And his assertion that the position he assumed on that point was undeniable, may be contrasted with the common sentiment of the legal profession, prior to the case of Arnold *v.* Mundy, that the entire bed was private property, (*Griffith's Law Reg.* 1291; *Gough* v. *Bell*, 2 *Zab.* 441, 490,) and with the statement of the New Jersey commissioners, in their communication to the Pennsylvania commissioners, in 1817: "The soil of the river, to the midway thereof, at least at and above the falls of Trenton, if not below, is vested by law in the owners of the adjoining land." His distinguished ability as a lawyer does not justify us in regarding this obiter dictum as conclusively settling the law on so important a matter. An examination of the opinions of our most eminent jurists, as contained in our state reports, shows that neither that assertion, nor scarcely any other in reference to the public and private rights to the land flowed by the waters

of the Delaware, can be regarded as undeniable, except so far as they have been the subject of direct adjudication. Upon almost all these points, the views of judges and lawyers have been extremely variant.

Nor can we yield to the construction placed by the courts of Pennsylvania upon the rights of that state and its citizens in this river. Their decisions are confessedly not in accordance with the common law, but rest upon peculiar considerations of state policy, more closely akin to the civil law. They are not limited to the Delaware nor dependent on the interpretation of the king's grant to Penn, but are applied as well to the Susquehanna and other rivers clearly within the state boundary.

I conclude, therefore, that the piers and bridge of the defendant are not erected upon the lands of the state and are not a purpresture.

It is insisted, in the next place, that they are a public nuisance, and as such ought to be restrained and abated by the Court of Chancery, because they stand in a river where there is a public right of navigation, and are not authorized by law. This absence of legal authority is asserted first, upon the claim that the general railroad law, passed in 1873, under which the defendant derives its franchises, does not permit the construction of a bridge in the Delaware river ; and secondly, upon the ground that there has been no such concurrent action by the State of Pennsylvania as is necessary to justify interference with the river as a common highway, under the agreement with that state made in 1783.

The defendant is incorporated under the " act to authorize the formation of railroad corporations and regulate the same," approved April 2d, 1873, upon articles of association filed by its incorporators, in which " the places from and to which the road is to be constructed or maintained and operated " are described as follows : " Its beginning point, at the boundary line between the States of Pennsylvania and New Jersey, in the middle of the Delaware river, in the township of Ewing, in the county of Mercer, in the State of New Jersey, some-

where between an island in said river called Slack's Island, northward of Yardleyville, in the state of Pennsylvania, and another island in said river called White's Island, southward of said Yardleyville; and its termination point, in the southerly line of the railroad of the Central Railroad Company of New Jersey, at or near the village of Bound Brook, in the township of Bridgewater, in the county of Somerset, in the State of New Jersey." The scope of this statute is *prima facie* co-extensive with the limits of the state, and must be so regarded, unless its terms fairly require narrower boundaries. The first section provides that the articles of association shall mention the *places* from and to which the road is to be constructed. This word *places* is sufficiently indefinite to indicate any locality within the state. The eleventh section authorizes the construction and operation of the railroad between the *points* named in the articles of association, commencing at or within and extending to or into any *town, city or village* named as the *place* of the termini of such road. It is urged that by force of these words, each terminus of the road must be confined to some town, city or village. Perhaps if this clause stood alone, as designating the limits of construction, such an interpretation would be entitled to prevail; but the twenty-third section enacts that companies whose roads shall be constructed under the provisions of the act, shall have the right to connect their roads with any railroads within this or any other state, and the duty of the courts is so to interpret every portion of the statute as that all of it may have effect. Now evidently, by this section, the legislature did not undertake to authorize the construction of roads beyond the limits of the state's jurisdiction, nor intend to authorize foreign corporations to build railroads within our territory. The purpose must have been to empower companies, organized under the act, to carry their roads (within the limits laid out in their articles of association,) to the state line, and there to connect with the road of the foreign corporation. But it is equally obvious that they did not mean to restrict this power of connection to those places where some town, city or village actually runs up

to the state line, for such a restriction would render the power practically nugatory without any good cause for the limitation, since, if it be desirable to connect our state railroads with foreign roads, no reason appears for making such connection only within some town, city or village.    For the purpose, then, of exercising the rights plainly intended to be conferred by this twenty-third section, the legislature, in my judgment, empowered corporations to locate and construct railroads between places designated in their articles of association, other than towns, cities or villages.

I find nowhere else in the act, any language which can be so construed as to exclude the Delaware river from its operation.    On the contrary, several considerations appear to me to indicate that the legislature must have contemplated a connection with railroads out of the state, across that river. In that direction existed the great demand for railroad transportation through New Jersey to the sea, in compliance with which, mainly, this law was enacted.    The need for such transportation over our northern boundary was comparatively unimportant.    Before this law was passed, there stood on our statute books an act passed March 30th, 1869, (*Pamph. L.,* *p.* 807,) entitled "An act to prevent accidents on railroads," the second section of which provided "that hereafter no railroad shall be laid upon any bridge across the Delaware river intended for public travel, unless special authority for that purpose be given by legislative act, particularly designating the bridges to be subjected to such use."    This general railroad law, in its thirty-eighth section, enacted that the provisions of that second section of the act of 1869 should not be considered to extend to, or to affect, in any way or manner, corporations which might be formed thereunder.    Certainly the legislature would not thus have expressly removed this prohibition against crossing the Delaware on existing bridges, if it had been intended not to authorize the crossing of that river at all.    And it seems to me manifest, that if the purpose had been to confine this power of crossing to existing bridges, such purpose would have been expressly averred.    The only

reason that can be imagined for such restriction is regard for the navigability of the river; and if that interest be so important as to require that the courts should be called on to imply the restriction, it should seem that it was sufficiently important and obvious for the courts to expect that the legislature would have expressly guarded it. But, in fact, no such importance pertains to the stream above the tide. At the time of the passage of the act, there were already thirteen bridges over the river between Trenton and Easton, a distance of not over sixty miles, each one of which interfered with navigation as much as might be expected of any railroad bridge likely to be built, and more than does the bridge now complained of; and the proof shows that none, even of these, has interposed any appreciable obstacle to the craft which have been wont to navigate the waters. And, surely, if the legislature intended to exclude such a stream from the general provisions of this act, in order to preserve its navigability, an examination will show that they have been equally cautious with other rivers and bays of the state which, in truth, afford useful avenues for commerce. But what do we find? The thirty-sixth section enacts " that it shall be lawful for any company incorporated under this act, in addition to the power hereinbefore given, to build viaducts over any navigable or other rivers, streams, or bay of water which said railroad may cross." Since then, the legislature has thus plainly expressed the idea that all the other waters of the state can be bridged under this act, without obstructing navigation more than is warranted by the usefulness of the object to be attained, I do not think that it intended or expected the courts to imply that the Delaware alone must be excluded from its provisions.

A further argument in favor of the restriction contended for, is based upon the language of the thirty-sixth section just quoted. It is urged that the words, " rivers, &c., which said railroad may cross," exclude the Delaware, because " to cross" means " to go from bank to bank;" and as the legislature could not confer the power so to cross the Delaware,

therefore that river is not intended.  Even if this interpretation were conceded, the result would be only to exclude the river from this section ; and there would still remain the necessity of finding sufficient reason to except it from the other provisions of the act which seem to embrace it.  But the suggested interpretation is not the fair one.  The evident purpose of the section was, not to limit the power of building viaducts to waters over which the railroads should wholly cross, but to confer the power of building them over any waters, so guarded as that the interests of navigation would be protected, and their protection was not at all enhanced by continuing the viaduct to the further bank.  The idea expressed by this word is therefore merely incidental to the main object in view, and should not so control the interpretation as to strip the provision of a large share of its utility. But even if we are to resort to a critical examination of terms, I think it will be found that we are not justified in saying the legislature could not have included the Delaware among rivers which it might say its railroads should *cross.* By the compact between New Jersey and Pennsylvania, ratified May 27th, 1783, (*Nix. Dig.* 967), it is declared that this river, from the northwest corner of New Jersey to the circular boundary of the State of Delaware, in the whole length and breadth thereof, is, and shall continue to be and remain a common highway, equally free and open for the use, benefit and advantage of the contracting parties, and that each state shall enjoy and exercise a concurrent jurisdiction within and upon the water between the shores of said river. In reference to this compact, Chancellor Green, in the case of *President, &c.,* v. *Trenton City Bridge Co.,* 2 *Beas.* 46, said : " It may, perhaps, be held that each state might, without a violation of the contract, authorize the erection of a bridge to the centre of the river within its own territory ; and yet such is not the practical construction which has been given to its terms.  Neither state has ever attempted to make such a grant : on the contrary, it is believed that in the charters of the numerous bridges which now span the river, from the north

station point to tide-water, each state has invariably granted
the privilege of building the bridge, not only within its own
territory, but from shore to shore, thus exercising, in the lan-
guage of the agreement, concurrent jurisdiction between the
shores of the river." The practice thus mentioned shows that
the legislature has usually, when exercising its concurrent
jurisdiction, under this inter-state agreement with the view of
providing for the construction of bridges over this river, em-
ployed language that imported an authority to cross the river
from shore to shore. And justly, too; for though its authori-
zation was not alone sufficient, as it has not exclusive jurisdic-
tion, yet, as it possessed jurisdiction of some sort over the
whole of the waters, for the purpose of guarding the common
highway, its permission was needed throughout by whomsoever
claimed the right to interfere at all with this public privilege.
Hence, it is a perfectly proper use of language to speak of the
railroads of New Jersey as *crossing* the Delaware under the
sanction of her laws.

I find, therefore, in the act, no reason to doubt, and ample
reason to believe, that the legislature intended to confer the
franchise of bridging the Delaware, so far as its authority
could avail for that purpose. It remains to consider whether
the necessary concurrence of Pennsylvania to the erection of
this viaduct is shown.

It should here be observed that no complaint of the want of
such concurrence is made by or on behalf of the sister state,
and that her rights will not be at all affected by our judgment
in this cause; nor do I doubt that, if her officers see reason to
complain, she has herself ample means to redress her wrongs.
New Jersey, moreover, has no interest to be subserved by the
withholding, on the part of Pennsylvania, of consent to such
structures as the legislature of this state has authorized. Under
these circumstances, we are not called upon to use extreme
vigilance, or draw very nice distinctions, for the purpose of
finding flaws in those evidences of her consent which may be
produced; nor are we at liberty to go beyond the compact
itself, in order to prescribe any particular form in which the

mutual consent of the states to an interference with the common highway must be expressed. This state of facts, then, is shown : It appears that the defendant and The North Pennsylvania Railroad Company are constructing the bridge in question, for the purpose of connecting their respective railroads, each building the half from the centre line to its own state's shore; that the last named company has, under the constitution and laws of Pennsylvania, full, express and specific power to connect its main line between Philadelphia and Bethlehem, by a branch railroad to, and a bridge across the Delaware river, with any railroad in this state, and for that purpose has located such branch road from its main line to the point in the centre of the river where the defendant's railroad begins. This being true, then Pennsylvania has given express authority to its corporation to bridge the Delaware, so as to connect with the New Jersey company ; and New Jersey has given like authority to its company to bridge the river, so as to connect with the Pennsylvania corporation. The powers so granted are not indeed the same power, but they are concurrent powers, and the consent which underlies these powers is one consent, the consent of both states, on the part of each, express to its own corporation, and implied to the other, that these two companies may construct a bridge in the Delaware, so as to connect their railroads. This is an exercise of concurrent jurisdiction, such as was contemplated by the agreement of 1783. It may not be so specific as has been usual ; but that arises from the fact that the states now, for the first, concur in granting, under general laws, franchises which hitherto this state gave only by special charters. The compact is equally observed by either mode.

I therefore conclude that there is lawful authority for the construction of the bridge in question.

No complaint is made in the information as to any impropriety in the mode of building the bridge, or that it creates any more impediment to public rights in the river than necessarily attends the use of the franchise granted.

Under these circumstances, the Chancellor rightly refused

the injunction asked for. He also decreed that the information be dismissed. Upon the hearing in this court, it was suggested, scarcely urged, that this portion of the decree was erroneous, even if in other respects it was correct. But I cannot yield to this suggestion. No replication seems to have been filed, although the time for so doing had long elapsed when the decree was made. No facts are alleged to be in dispute, nor are any undisclosed facts said to be important for the decision of the cause. In the brief of counsel presented to the Chancellor and to this court, the hearing is said to be equivalent to a final one. The dismissal was doubtless the result of an impression that no further contest, except by appeal, was intended, and no effort has been made to remove that impression. Nor are we informed on what basis further litigation can be deemed advisable.

I think, therefore, the decree as made should be affirmed.

Decree unanimously affirmed.