108 N.J. Super. 564 (1970)
262 A.2d 21
STATE BOARD OF EDUCATION, COMMISSIONER OF EDUCATION, AND ATTORNEY GENERAL OF NEW JERSEY, PLAINTIFFS,
v.
BOARD OF EDUCATION OF NETCONG, NEW JERSEY; PALMERINO STRACCO, PRESIDENT, MICHAEL J. ROMANO, VICE PRESIDENT, SAMUEL H. MORGAN, JR., ROBERT McKELVIE, ANTHONY ARBOLINO, DONALD G. CIVITELLA, ALFRED J. TOGNO, LAWRENCE J. FASCHAN, FRANK V. DELLOSSO, INDIVIDUALLY, AND AS MEMBERS OF THE NETCONG BOARD OF EDUCATION; AND JOSEPH M. STRACCO, SUPERINTENDENT OF SCHOOLS OF NETCONG; AND VINCENT M. TOGNO, PRINCIPAL, NETCONG HIGH SCHOOL, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 9, 1970.
*567 Mrs. Virginia Long Annich, Deputy Attorney General, for plaintiffs (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. George Benson for defendants (Messrs. Oscar Meyerson, Michael C. Willner and George Benson on the brief).
STAMLER, JOSEPH H., J.S.C.
Plaintiffs are the State Board of Education (hereinafter "state board"), the Commissioner of Education and the Attorney General of New Jersey. Defendants are the Netcong Board of Education (hereinafter "Netcong board"), the superintendent of schools of Netcong and the principal of the Netcong High School. Plaintiffs seek a declaratory judgment that a certain resolution and the implementation thereof are in violation of the United States Constitution and the Constitution of the State of New Jersey. A permanent injunction is demanded. Defendants assert that plaintiffs have no standing to seek relief and that what they have done is not proscribed by law.
The parties have stipulated that the State Board of Education bears the responsibility for the general supervision and control of public education in this State. In furtherance of this responsibility, the state board has the power to make and enforce rules implementing and carrying out the school laws of this State and has all other powers, in addition to those specifically provided by law, requisite to the performance of its duties. The Commissioner of Education has supervisory power over all schools of this State receiving support or aid from state appropriations and is responsible for the enforcement of all rules prescribed by the state board. The Attorney General is responsible for the enforcement of the provisions of the Constitution and all other laws of this State, and of the Constitution of the United States as interpreted by the courts.
On September 2, 1969 the Netcong board enacted the following resolution:
*568 That the Superintendent be instructed by the Board of Education to institute prayers in the Netcong Schools, forcing no student to pray if unwilling but denying no student the right to pray, details to be worked out by the Board of Education.
It was further resolved that
Members of the clergy from the communities of Netcong and Stanhope be invited to meet with representatives of the Board of Education and compose a suitable prayer for the Board's consideration. In the interim, the Superintendent is instructed to institute 30 seconds of silent meditation until the Board takes further action. [Emphasis supplied]
On September 10, 1969 the Netcong board rescinded its resolution of September 2 and enacted the following:
On each school day before class instruction begins, a period of not more than five minutes shall be available to those teachers and students who may wish to participate voluntarily in the free exercise of religion as guaranteed by the United States Constitution. This freedom of religion shall not be expressed in any way which will interfere with another's rights. Participation may be total or partial, regular or occasional, or not at all. Non-participation shall not be considered evidence of non-religion, nor shall participation be considered evidence of or recognizing an establishment of religion. The purpose of this motion is not to favor one religion over another nor to favor religion over non-religion but rather to promote love of neighbor, brotherhood, respect for the dignity of the individual, moral consciousness and civic responsibility, to contribute to the general welfare of the community and to preserve the values that constitute our American heritage. [Emphasis supplied]
On September 16, 1969 the Netcong board adopted the following supplementary resolution:
BE IT RESOLVED that the Superintendent of Schools be authorized, empowered and directed to implement the resolution creating a period for the free exercise of religion in whatever manner, in the exercise of his discretion, he considers best under the circumstances. [Emphasis supplied]
The implementation of the resolution has occurred in the following way: At 7:55 A.M. in the Netcong High School *569 gymnasium, immediately prior to the formal opening of school, students who wish to join in the exercise either sit or stand in the bleachers. A student volunteer reader, assigned by the principal on a first come, first serve basis, then comes forward and reads the "remarks" (so described by defendants) of the chaplain from the Congressional Record, giving the date, volume, number and body whose proceedings are being read. The selection of material to be read is made by the volunteer reader, with the approval of the high school principal in a purely ministerial manner to insure that the material used complies with the evinced purposes of the board's resolution. The volunteer reader is free to add remarks concerning such subjects as love of neighbor, brotherhood and civic responsibility. At the conclusion of the reading the students are asked to meditate for a short period of time either on the material that has been read or upon anything else they desire.
In October 1969 the Commissioner of Education requested an opinion of the Attorney General as to whether the resolution of the Netcong board and the implementation thereof conformed with the provisions of the First Amendment to the United States Constitution. On November 24, 1969 the Attorney General rendered to the Commissioner a formal opinion which concluded that the resolution of the Netcong board and the implementation thereof violate the First Amendment to the Constitution of the United States. On November 26, 1969 a copy of the Attorney General's opinion was mailed to the attorney for the Netcong board at the attorney's request.
On December 1, 1969 the Commissioner sent a telegram to the Netcong board calling upon it to rescind the resolution and to cease and desist from all practices pursuant thereto.
On December 2, 1969 the Netcong board met in regular session and resolved to maintain both the resolution and the implementation thereof in the Netcong schools, notwithstanding the opinion of the Attorney General and the directive of the Commissioner of Education.
*570 On December 3, 1969 the state board unanimously authorized and called upon the Attorney General to take legal action.
On December 4, 1969 the Commissioner received a letter from the secretary to the Netcong board reiterating the position which the Netcong Board took on December 2, 1969 and stating, in part, that
* * * until such time as the constitutionality of our program has been judicially determined, we cannot consider our program to be in violation of the law of the land, notwithstanding our respect for the Attorney General and his office.
On December 5, 1969 the state board sent a telegram advising the Netcong board of its December 3, 1969 decision to start suit.
On December 9, 1969 a verified complaint was filed and an order to show cause issued. The court's suggestion that the matter be considered on the return day as cross-motions for summary judgment on stipulated facts was accepted by all counsel.
Without objections from either side the court received the amicus brief of the In God We Trust Committee, the Tenth District (Morris County) of V.F.W. (Veterans of Foreign Wars), the Morris County Conservative Club, Morris County American Legion, West Morris "T.R.A.I.N." (Time to Restore American Independence) Committee and the Essex County Conservative Club.
At the outset defendants argue that the state board, the Commissioner and the Attorney General have no standing to bring this action. The lack of standing, it is urged, arises from expressions in Everson v. Board of Education, 330 U.S. 1, 18, 67 S.Ct. 504, 91 L.Ed. 711 (1946), and in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), in which the states are admonished to take a neutral position in their relations with groups of believers and non-believers in matters of religion.
*571 Defendants assert that taxpayers of Netcong or parents of a child attending Netcong High School are the only proper parties plaintiff. This would require one segment of the small community to engage in heated controversy with another segment and be forthwith labelled, not as litigants, but as "Anti-God," "Anti-Christ" or "Communists." Telegrams and letters were sent to the court during the pendency of this litigation which clearly and depressingly set forth the temper of the community and the eagerness of certain "citizens" to create division, diversion and prejudice.
However, this court, in determining the status of plaintiffs in the instant action, cannot and will not be influenced in any way by the telegrams, letters or labels. The law, and not the public clamour or fear thereof, is the polestar.
Where standing is placed in issue, the question is whether the person whose standing is challenged is a proper party to such an adjudication of a particular issue and not whether the issue itself is justiciable. Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).
The state board has supervision and control of public education (N.J.S.A. 18A:4-10) and is obliged to make and enforce regulations for implementing and carrying out the school law of this State. N.J.S. 18A:4-15. The Commissioner is constrained to enforce all rules prescribed by the state board. N.J.S. 18A:4-23. The Attorney General must enforce the provisions of the United States Constitution, the New Jersey Constitution and all other laws of the State. N.J.S. 52:17A-4.
The United States Constitution, Art. VI, cl. 3, states in pertinent part: "* * * all executive and judicial officers both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; * * *."
The members of the state board, the Commissioner and the Attorney General have taken the required oath. N.J.S.A. 41:1-2.
*572 In Sills v. Hawthorne Board of Education, 84 N.J. Super. 63 (Ch. Div. 1963), aff'd. 42 N.J. 351 (1964), the Attorney General and the State Board of Education sought and were granted injunctive relief against a local board in a case involving compulsory prayer in school. This court is advised that the standing of plaintiff to sue was fully briefed. However, neither the trial court nor the Supreme Court saw fit to comment. It must be assumed that no affirmance would have been forthcoming had our Supreme Court not recognized the Attorney General and the State Board as proper parties plaintiff.
In the performance of the duties imposed upon him the Attorney General has been described as the "defender of the public interest." Public Service Co-ordinated Transport v. State, 5 N.J. 196, 208 (1950). See also Alexander v. New Jersey Power & Light Co., 21 N.J. 373 (1956).
In Wilentz v. Hendrickson, 133 N.J. Eq. 447, 455 (Ch. 1943), aff'd. 135 N.J. Eq. 244 (E. & A. 1944), the court noted:
In Attorney-General v. Delaware and Bound Brook Railroad Co., 27 N.J. Eq. 631, Dixson, J., remarked: "In equity as in the law court, the Attorney-General has the right, in cases where the property of the sovereign or the interests of the public are directly concerned, to institute suit, by what may be called civil information, for their protection. The state is not left without redress in its own courts because no private citizen chooses to encounter the difficulty of defending it, but has appointed this high public officer on whom it has cast the responsibility and to whom, therefore, it has given the right of appearing in its behalf and invoking the judgment of the courts on such questions of public moment. [Emphasis supplied]
It cannot be doubted that this case is one of "public moment." Although not named parties to this action, the children of the State who attend public schools are the ones most affected by whatever the determination of this court may be. Traditionally, the State has a legitimate interest in protecting the welfare of its children. In Prince v. Massachusetts, 321 U.S. 158, 168, 64 S.Ct. 438, 88 L.Ed. 645 (1943), the Supreme Court said:
*573 The state's authority over children's activities is broader than over like actions of adults. * * * What may be wholly permissible for adults therefore may not be so for children, * * *.
Our Legislature has declared by statute what the courts for many years have held: Children are the wards of the State. In N.J.S.A. 2A:4-2 the following appears:
It is hereby declared to be a principle governing the law of this state that children under the jurisdiction of said court are wards of the state, subject to the discipline and entitled to the protection of the state, which may intervene to safeguard them from neglect or injury and to enforce the legal obligations due to them and from them.
To urge, as defendants do, that the State is precluded from access to the courts in seeking a judicial determination in matters involving "religion" or "nonreligion" would place the issue in the streets, and this nation would then become a government of men and not of law. It is concluded that plaintiffs have standing.
In issue is the application of the First Amendment to the United States Constitution to the program undertaken by defendants. In relevant part the First Amendment provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *.
It is well settled that the First Amendment is applicable to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).
Plaintiffs argue that applicable decisions of the United States Supreme Court lead ineluctably to the conclusion that the resolution of the Netcong board and the subsequent implementation thereof are unconstitutional because such action is the "establishment of religion" as defined by that court. Defendants' position is that the program is *574 either "free exercise" of religion or not a religious exercise at all. In one part of their brief defendants say:
Although plaintiffs' statement of facts demonstrates its knowledge that the free exercise of religion program at Netcong High School is comprised of a period of silence, or meditation, its brief fails to separate these two aspects in its legal arguments. Without in any manner conceding the validity of the State's contentions that reading from the Congressional Record may be an unconstitutional infringement upon the First Amendment, defendant [sic] acknowledges that the issue might at least be open to reasonable argument. However, the same cannot be said for an attack upon the meditation aspect of the program.
With regard to meditation in schools without more, Professor Paul A. Freund, a noted commentator on religion and the law, has said:
Nor does any decision, in my judgment, prevent a public school class from engaging in a moment of silent meditation or reverence, as the teachings of the individual spirit or inheritance may prompt. [Freund, Religion and the Public Schools, The Legal Issue. (1965)].
Mr. Justice Brennan in School District of Abington Tp. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), by way of dictum said:
It has not been shown that * * * the observance of a moment of reverent silence at the opening of class, may not adequately serve the solely secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government. [at 281, 83 S.Ct. at 1602]
Such a program of silent meditation by itself may give the child the opportunity to reflect on the morning or breakfast prayer in which he and his father participated at home before school, or to contemplate the sermon in the house of worship which he and his family attended the preceding Saturday, Sunday or evening. The Netcong *575 board, by directing the wedding of meditation and a religious reading, must believe that the parents of its students or their respective spiritual advisers are incapable of providing their children with something sufficiently worthwhile upon which to meditate.
For the purpose of a determination of the issues before this court, the program of the Netcong board cannot be considered in separate and divisible parts. Although the children are asked to meditate either upon the "remarks" read from the Congressional Record or upon anything else they desire for a short period of time, such reading is an integral part of the entire program and no child is invited solely for the meditation period. To be in attendance for only the meditation, a child must walk in at the beginning of or during or immediately at the conclusion of the reading, forthwith identifying his late arrival as unwilling to listen to the reading. He might just as well have meditated on the school steps or absented himself entirely until regular classes were ready to begin.
It is plaintiffs' position that the program violates the Establishment Clause. Defendants state that it is permissible either as a religious activity within the Free Exercise Clause, or alternatively should be considered as a secular educational program "to promote love of neighbor, brotherhood, respect for the dignity of the individual, moral consciousness and civic responsibility to contribute to the general welfare of the community and to preserve the values that constitute our American heritage." (Netcong board resolution, September 10, 1969). This latter position suggests a laudable and purely secular purpose.
There is an absolute duty of public schools to teach to our youth honesty, cooperativeness and truthfulness and to impart sound moral consciousness and other virtues. If this is the prime purpose of the Netcong board and the Netcong program is in no way a religious exercise, why then should any student be permitted to absent himself from so important a part of the educational process *576  something that should be common and compulsory for all children in the public schools? Permissive nonattendance in a vital school program is not consistent with secularity.
The earnestness of this position is questioned when defendants on argument described the rescission on September 10 of the nondenominational prayer resolution of September 2 as resulting from a realization by the Netcong board of the "error of their ways." This was followed at the same meeting by passage of the resolution here under consideration. The flaw in the nonreligious argument becomes more apparent when the introductory language of the resolution is considered:
On each school day before class instruction begins, a period of not more than five minutes shall be available for those teachers and students who may wish to participate voluntarily in the free exercise of religion as guaranteed by the United States Constitution. [Resolution, September 10, 1969; emphasis supplied]
If the Netcong program is truly a secular activity, there is no Establishment infringement. If it is in fact a religious exercise, then the paradox which troubled Mr. Justice Brennan in Abington, supra, comes into play. He said:
[A]n increasingly troublesome First Amendment paradox: [is] that the logical interrelationship between the Establishment and Free Exercise Clauses may produce situations where an injunction against an apparent establishment must be withheld in order to avoid infringement of rights of free exercise. [374 U.S., at 247, 83 S.Ct., at 1585]
Professor Alan Schwarz concludes in a recent Yale Law Journal article that Mr. Justice Brennan, in the same opinion, endorses this guideline:
* * * the standard would permit the prima facie evidence of a violation represented by any assistance to religion to be overcome by proof that the purpose of the aid was to protect free exercise, whether or not such protection is constitutionally required. [Schwarz, "No *577 Imposition of Religion: The Establishment Clause Value," 77 Yale L.J. 692, 707 (1968)].
For the most part the parties rely on precisely the same United States Supreme Court decisions, but their respective interpretations differ. Equating its own interpretations of the United States Constitution with the document itself, and requiring a reading of the document itself as if it contained a physically interlineated printed translation taken from its opinions, the United States Supreme Court said in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958):
Every state legislator and executive and judicial officer is solemnly committed by oath, taken pursuant to Article VI, ¶ 3, to "support this Constitution." [Emphasis supplied]
In the United States Supreme Court the doctrine of stare decisis has never enjoyed high potency, historically or theoretically, in cases of constitutional interpretation. Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406-408, 52 S.Ct. 443, 76 L.Ed. 815 (1932). (Brandeis, J., dissenting). Within our judicial system, however, there is an absolute duty, an obligation of obedience, imposed on trial courts to apply the law as last pronounced by superior judicial authority. A trial court cannot claim the right to an independent interpretation of the United States Constitution, and a constitutional challenge is said to be "insubstantial" when the same question has previously been adjudicated by the Supreme Court. California Water Service Co. v. City of Redding, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323 (1958); Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed.2d 152 (1933).
The obligation to follow judicial precedent is present only when the rule of decision is clear. Plaintiffs and defendants both argue that it is well settled in favor of their respective adversary positions.
The amicus brief of the In God We Trust Committee urges this court to "overrule" the Supreme Court because it failed *578 to properly consider the genesis of the First Amendment and because there exists an "overwhelming public sentiment" nationally in favor of prayer in school. In support of these positions attention is directed by amicus to the dissenting opinions of the Justices of the United States Supreme Court in various Establishment and Free Exercise cases, and to public opinion polls, such as the Gallup, Harris and Good Housekeeping polls, one of which purports to show that 82% of the public favors prayer in public schools. The validity of such "overwhelming" sentiment is questionable. For example, the General Assembly of the United Presbyterian Church (judicially noted to represent a large number of Americans) takes a position directly contrary to the In God We Trust Committee. In 1963 the General Assembly of the United Presbyterian Church passed the following resolution:
The 175th General Assembly Gives thanks to God for the civil procedure termed "due process of law", which provides for orderly resolution of social conflict. We affirm the indispensable role of the Supreme Court of the United States in this process. While responsible criticism of the Court's opinion is within the tradition of our nation, we are out of sympathy with the kind of criticism which impugns the integrity of the highest court of the land.
Records its endorsement of the principle laid down by the Supreme Court in the Regent's prayer case (Engel verses Vitale, June 25, 1962) that "in this country it is no part of the business of government to compose official prayers for any group of the American people to recite as part of a religious program carried on by the government" * * *
Reminds the church that the development and practice of Christian worship is the inescapable obligation of the congregation and the family, and not of the public schools.
Warns the church of an all-too-human tendency to look to the state and its agencies for support in fulfilling the church's mission. Such a tendency on the American scene endangers true religion as well as civil liberties. Consequently, this General Assembly calls the church to renewed worship, study, work, and sacrifice to fulfill its mission as God's people in the world. [Presbyterian Life, vol. 22, No. 22, p. 14 (November 15, 1969)].
Assuming arguendo that there is such "overwhelming sentiment," it is certain that the Netcong High School history *579 or civics text books would tell our friends of court (amicus) that the available procedure for constitutional amendment is through the Legislative and not the Judicial Branches of government. Surely, good citizens who believe that it is "Time To Restore American Independence" have learned why the Founding Fathers made it more difficult to amend the Constitution than by the simple majority requisite for everyday legislation. This was to protect the minority; were it otherwise, the Bill of Rights, which includes the First Amendment, would have become subject to repeal by a simple majority.
In urging that "the avowed disruptive purpose of a minority voice be not allowed to further injure the moral foundation of our country and society," the amicus brief cites and quotes only the minority voices of the Supreme Court.
True concern for the moral well-being of our youth is expressed by both amicus and defendants. At the same time, by adoption of the September 10 resolution as the substitute for a nondenominational prayer resolution of September 2, defendants do not encourage in the youth of Netcong correction by proper legal procedures of an alleged wrong, but rather by scheme and subterfuge foster an avoidance of "moral consciousness and civic responsibility" and an evasion and erosion of "the values that constitute our American heritage." (The last two quoted phrases are taken from the September 10 resolution.)
Defendants say that "prayers" are not being read to the students; they say that the readings from the Congressional Record are simply "remarks" and not a "religious exercise" or "prayer," notwithstanding that words read are the words of the chaplain or visiting clergyman.
It is true, as plaintiffs assert, that the United States Supreme Court has time and again stated that any act of an agency of government at any level which has the effect of establishing or imposing religion is forbidden. It is also true, as defendants posit, that our highest court has time and again held that no agency of government may interfere with the free exercise of religion. But the guidelines are not so distinct *580 that a given set of distinguishable facts can be deemed to foreclose a trial court determination.
This court must first determine whether there is a violation of the Establishment Clause, and if there is no violation, then there is no case for plaintiffs. If there is an establishment, next to be considered is whether there is an interference with free exercise of religion. If there is both establishment and interference, which of them must be subordinated in the head-on confrontation? This adjudicatory process is consistent with the balancing approach suggested by Mr. Justice Brennan, who in Abington, supra, indicated that prima facie evidence of aid in establishment might be overcome by proof that the purpose of the aid was to protect free exercise.
The Netcong program is not saved from the establishment bar by the permissive attendance feature.
Defendants, using intemperate and unwarranted adjectives to describe the Justices who comprised the majority of the Supreme Court in recent First Amendment "religion" cases, characterize court views as based upon a recently concocted, ultra-liberal construction of our Federal Constitution. Eighty years ago the Wisconsin Supreme Court considered objections from a group of Catholic parents to the reading from the King James Bible in public schools. There, as in the case at bar, attendance of the children was not compulsory. The entire court agreed that the practice violated the Constitution. State ex rel. Weiss v. District Board of School District No. 8 of Edgerton, 76 Wis. 177, 199, 44 N.W. 967, 975 (1890). Although unanimous in its judgment, three separate concurring opinions were filed. In writing for the court Justice Lyons said:
The answer of the respondent states that the relators' children are not compelled to remain in the school-room while the Bible is being read, but are at liberty to withdraw therefrom during the reading of the same. For this reason it is claimed that the relators have no good cause for complaint, even though such reading be sectarian instruction. We cannot give our sanction to this position. When, as in this case, a small minority of the pupils in the public school is excluded, for any cause, from a stated school exercise, particularly when such *581 cause is apparent hostility to the Bible, which a majority of the pupils have been taught to revere, from that moment the excluded pupil loses caste with his fellows, and is liable to be regarded with aversion, and subjected to reproach and insult. But it is a sufficient refutation of the argument that the practice in question tends to destroy the equality of the pupils which the constitution seeks to establish and protect, and puts a portion of them to serious disadvantage in many ways with respect to the others. [44 N.W., at 975]
This view was restated with approval in the United States Supreme Court 22 years ago in the "released time" case, McCollum v. Board of Education, 333 U.S. 203, 227, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
In Engel v. Vitale, 18 Misc.2d 659, 191 N.Y.S.2d 453 (Sup. Ct. 1959), the trial court upheld the New York Regents' non-denominational prayer," but to do so it required school authorities to promulgate regulations to assure that participation would be entirely voluntary and that nonparticipation would not be penalized, suggesting, for example, a regulation which would permit non-participating pupils to arrive after the exercises. This 22-word prayer, requiring less than ten seconds of reading time, is an innocuous, non-sectarian and universal as could possibly be formulated. One commentator has described the prayer as a "to-whom-it-may-concern" prayer. Affirmed in the New York Court of Appeals by a 4-3 vote, the case was appealed to the United States Supreme Court. In a 6-1 decision (two Justices not participating) the Supreme Court reversed. Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962):
There can be no doubt that New York's state prayer program officially establishes the religious beliefs embodied in the Regents' prayer. The respondents' argument to the contrary, which is largely based upon the contention that the Regents' prayer is "non-denominational" and the fact that the program, as modified and approved by the state courts, does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects. Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the *582 Establishment Clause, as it might from the Free Exercise Clause, of the First Amendment, both of which are operative against the States by virtue of the Fourteenth Amendment. [at 431, 82 S.Ct., at 1266-1267.]
The school board, the principal and a teacher required by law to be in attendance all approve of the Netcong program, either tacitly or explicitly; their recommendation of the program clearly influences attendance. Here there is ever-present peer pressure and certainly an aura of board, superintendent, principal and teacher acceptance. Public schools, unlike the halls of Congress, present a special case. This audience is without the maturity to express independence and is, indeed, captive when pupils are obliged to identify themselves by allegiance or withdrawal from the "program." See Abington, supra, opinion by Justice Brennan, 374 U.S., at 299-300, 82 S.Ct. 1261. Certainly voluntary participation does not support defendants' position.
Is it a religious exercise to read the "remarks" of the chaplain? Are they truly and simply secular remarks? Received as an exhibit at the hearing were copies of the Congressional Record from October 1, through December 9, 1969. The Congressional Record generally begins: "The Chaplain, the Reverend ____, offered the following prayer" (emphasis supplied). From October 1 through December 9, 1969 the text of the Congressional Record includes quotations by the various chaplains from Romans, Deuteronomy, Ephesians, Isaiah, Samuel, Lamentations, Corinthians, Proverbs, Thessalonians, John, Matthew, Chronicles, Peter and, on 16 separate occasions, from Psalms. With respect to reading from the Bible, the trial court found in Abington that the reading of Bible verses, even without comment, constitutes a religious exercise. In the Congressional Record, where biblical quotations are used they are followed as well by the prayers of the individual clergyman. Further, when the Bible is not quoted by a chaplain the "remarks" set forth in the Congressional Record consist exclusively of a prayer. Each chaplain commenced his invocation with the words "O *583 God," "Eternal God," "Eternal Father," or the like, and ended with the word "Amen." In each instance it clearly appears that there has been a "solemn avowal of divine faith and supplication for the blessings of the Almighty." (Quotation from Engel, supra, at 426, 82 S.Ct., at 1264.
If the Regents' Prayer may not be read in the public schools, it must follow that the readings of "remarks" from the Old Testament and the New Testament must be an imposition or establishment violation, for the necessary consequence of Engel is that any devotional reading is unconstitutional.
To call some of the beautiful prayers in the Congressional Record "remarks" for a deceptive purpose is to peddle religion in a very cheap manner under an assumed name. This type of subterfuge is degrading to all religions.
This does not mean that the Bible may not be read or studied as a work of literature, even though a reading or study may cause some to accept or reject it from a religious standpoint. The study of the Bible in a literature course, the study of the Congressional Record in a civics or government course, or of Washington's Farewell Address or the Northwest Ordinance in a history class, is not proscribed to public school students, even if a by-product of this secular activity is harmful or beneficial to a particular religion. And, of course, there is no restraint upon parents or guardians who inculcate a specific religion in youth in the proper place and at the proper time. To hold otherwise would undermine the family's right to determine the religious or nonreligious beliefs of its members, especially its children. Our American heritage, which defendants seek to preserve, has embodied the legitimate interest in implementing and encouraging the exercise of that private choice to the extent of making religion or nonreligion a private affair. Privacy and complete freedom of choice is the core establishment value.
Direct imposition of religion by governmental action is per se unconstitutional. Indirect establishment can be condoned where it is the only means of obtaining an absolutely *584 compelling and otherwise unobtainable secular goal. In considering the paradox expressed by Mr. Justice Brennan in Abington, supra, the principle of free exercise will be held superior where the imposition or establishment danger is indirect and insubstantial. This is the basis for defendant's Free Exercise argument.
In Abington, it was said:
Its [the Free Exercise Clause] purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. [374 U.S., at 223, 83 S.Ct., at 1572]
Defendants have not shown that the order to cease and desist issued by the state board has the coercive effect of preventing any or all pupils from following the requirements of their respective religious doctrines.
While I do not question the judgment of experienced educators that the challenged practices may well achieve valuable secular ends, it seems to me that the State acts unconstitutionally if it either sets about to attain even indirectly religious ends by religious means, or if it uses religious means to serve secular ends where secular means would suffice. [Brennan, J. in Abington, supra, at 281, 83 S.Ct. at 1603].
In other words, to succeed in showing that Free Exercise rights compellingly outweigh Establishment dangers, it must be clearly shown that the conscience of the one who asserts the right demands of him, as an inexcusable religious duty, the performance of a positive act which can only do harm to him if not done and will not infringe upon the security or freedom of others. See Clark, "Guidelines for the Free Exercise Clause", 83 Harv. L. Rev. 327, 363 (1969), wherein all the important Free Exercise cases are considered.
Is the Netcong program vital and essential to the success of its intended secular goals? Would a discontinuance of the program result in the inculcation of irreligion through the public school system? Would its discontinuance produce *585 a dilution of the religious beliefs of those who attend the Netcong schools? Is the Netcong program the only available method of conveying to our youth a sound moral conscience and of teaching truthfulness and other laudable virtues? Do the local board, the superintendent and the principal of Netcong High School truly believe that they and their teachers are completely unqualified and ill-equipped to teach their students to think about right and wrong without pinning the school curriculum closely to one or another reading from the Bible or other expression of ordained truth? The answer to each of the foregoing questions is in the negative. There is not an iota of proof before this court to support even a partial affirmative answer to any of the foregoing questions. If the Netcong program is related to goals such as morality, truth, honesty and kindness, which goals should be impressed firmly in all, then such ideals should be achieved by all  theists and nontheists, children and parents, pupils and educators, teachers, principals and school board members alike.
It is concluded that the Netcong program and the implementation thereof violates the First Amendment, and that the defense of Free Exercise as set forth in the case at bar is untenable.
An injunction will issue forthwith, enjoining and restraining defendants from a continuation of the program and any implementation thereof. Order to be submitted. No costs.